SIXTH DIVISION
April 13, 2007

Nos. 1-06-2135 & 1-06-2061 cons.

| | | |
|---|---|---|
| *In re* STEPHEN K., a Minor, | ) | |
| | ) | |
| Respondent-Appellee, | ) | |
| | ) | Appeal from the |
| (The People of the State of Illinois | ) | Circuit Court of Cook |
| | ) | County, Illinois, |
| Petitioner-Appellee, | ) | Child Protection Division. |
| v. | ) | |
| | ) | No. 05 JA 809 |
| Kathy K., Mother of Stephen K., | ) | |
| | ) | Honorable |
| Respondent-Appellant). | ) | Mary Lane Mikva, |
| | ) | Judge Presiding. |
| _____ | ) | |
| | ) | |
| *In re* STEPHEN K., a Minor, | ) | |
| | ) | |
| Respondent-Appellee, | ) | |
| | ) | |
| (The People of the State of Illinois | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Stephen K., Sr., Father of Stephen K., | ) | |
| | ) | |
| Respondent-Appellant). | ) | |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

At an adjudicatory hearing, the circuit court found the respondents, Kathy K. and Stephen

K., medically neglected and exposed their child, S.K., to an injurious environment. At a

1

Nos. 1-06-2135 & 1-06-2061 cons.

subsequent dispositional hearing, the court ruled that the respondents were unable for some reason other than financial circumstances alone to care for, protect, train or discipline their child, and the minor was made a ward of the court and placed in the custody of the Department of Children and Family Services. The respondents now appeal.

The mother, Kathy K., contends that: (1) the State failed to establish S. K. was medically neglected as a result of her actions; (2) the trial court's finding that she was unable for some reason other than financial circumstances alone, to care for, protect, train or discipline her child was against the manifest weight of the evidence; (3) the trial court erred in refusing to admit evidence of S. K.'s hospitalization after he was removed from the respondents' home and while in foster care; and (4) the adjudication of wardship should be dismissed because under Illinois law she had no duty to obey specific treatment plans and recommendations of the healthcare professionals treating her child.

The father, Stephen K., solely contends that he was denied due process when, at the adjudicatory hearing, the circuit court refused to admit evidence demonstrating the minor's need for hospitalization while under the care of the foster parents. For the following reasons we affirm the trial court's adjudicatory and dispositional hearing orders.

I. BACKGROUND

S.K. was born on November 7, 1990, and was diagnosed with cystic fibrosis shortly thereafter. On August 4, 2005, S. K. was taken into the custody of the Department of Children and Family Services (DCFS) and on August 5, 2005, the State filed a petition for an adjudication of wardship. In that petition, the State alleged that S.K. suffered medical neglect and

2

Nos. 1-06-2135 & 1-06-2061 cons.

malnutrition, lived in an injurious environment and suffered a risk of physical harm by

respondents Kathy K. and Stephen K., in violation of sections 2-3(1)(a), 2-3(1)(b) and 2-3-2(ii)

of the Juvenile Court Act of 1987 (Act). 705 ILCS 405/2-3(1)(a), (1)(b), 2-3(2)(ii) (West 2002).

The State alleged the following facts in support of these allegations:

> "On or about July 20, 2005, this minor was admitted to the University of Chicago
>
> Children's Hospital with a history of coughing up blood. Medical personnel have
>
> diagnosed this minor with cystic fibrosis, chronic malnourishment, and long
>
> standing medical neglect. Further, medical personnel have indicated that this
>
> minor's condition is potentially life threatening if not treated appropriately.
>
> Mother and father have an extensive history of marginal medical compliance on
>
> behalf of this minor. This minor will require close monitoring, exact medication
>
> compliance and regular medical follow-up upon discharge. Mother and father
>
> were residing together until approximately July, 2005. Mother reports a history of
>
> domestic violence with father."

At the adjudicatory hearing, the State's first witness was Dr. Jill Glick, the medical

director of the child protective services (CPS) team at the University of Chicago Hospital (UCH).

The court qualified Dr. Glick as an expert in pediatrics, pediatric emergency, and child abuse

pediatrics.[1] On direct examination, Dr. Glick testified that as head of the CPS team at UCH, in

July 2005, she was first involved with S.K.'s case when she was approached by pulmonologist

Dr. Lucille Lester, S.K.'s primary treating physician. Dr. Lester had expressed her long-standing

---

[1]Dr. Glick was not qualified as an expert in cystic firbrosis.

3

Nos. 1-06-2135 & 1-06-2061 cons.

concern about the respondents' ability to provide S.K. with adequate medical care. Dr. Lester indicated that even though S.K. had a worsening lung disease, the family did not follow through with instructions to obtain adequate medication. Dr. Lester was also concerned that S.K. suffered from "chronic malnourishment secondary to lack of appropriate environmental nutrition given to him," because he "had not gained weight since [M]arch of [2005]." According to Dr. Glick, Dr. Lester was "very uncomfortable" sending S.K. home, as he appeared depressed and was missing school, and she wanted Dr. Glick's assessment of the situation.

Dr. Glick further testified that S.K. was diagnosed with cystic fibrosis shortly after birth, and that he had been treated for the disease at UCH many times throughout his life. Dr. Glick explained that cystic fibrosis is a multisystem disease which primarily affects the lungs and the gastrointestinal (GI) tract. According to Dr. Glick, cystic fibrosis patients are missing enzymes for digestion, have abnormalities in their salt metabolism, and a progressive pulmonary disease. Consequently, cystic fibrosis patients need daily ongoing medication by mouth and by aerosol to keep their airways open, and physiotherapy (with a "vibratory" vest) to battle the mucus production that clogs up their airways. Dr. Glick noted that without a daily regimented plan of medication, and chest therapy, the disease will progress.

Dr. Glick also testified that because a good number of cystic fibrosis patients have problems with their GI track and digestion, resulting in serious diarrhea and weight loss, they must eat a caloric- and vitamin-enriched diet. Moreover, the diet must include a series of enzymes that help digestion and are timed and administered according to the type of food the patient is eating.

4

According to Dr. Glick, children with cystic fibrosis are susceptible to infections because their immune systems are suppressed by the disease, often causing them to cough up blood or have bad coughing spells or fever. Dr. Glick also testified that although many patients with cystic fibrosis die in their 30s and 40s, if treated properly "they can have productive lives," and some may live longer. However, Dr. Glick also admitted that even with optimal care, cystic fibrosis patients will have exacerbations and pulmonary problems.

Dr. Glick next testified that in assessing S.K.'s situation, she consulted the minor's treating medical team, including Dr. Lester, nurse Jeanine Cheetham, and other pediatric residents working under Dr. Lester's guidance. Dr. Glick stated that she also reviewed S.K.'s medical records and spoke with the social worker assigned to his case. In her assessment, in July 2005, Dr. Glick also interviewed and physically examined S.K., and remarked that he was not interactive and instead appeared very depressed and very thin at the waist.

Dr. Glick further testified that Dr. Lester had informed her that she and her staff had educated both of the respondents about cystic fibrosis on numerous occasions, and had informed them about the "very ultimate importance of strict medical compliance," including attending all of S.K.'s medical appointments, and providing him with proper nutrition. Dr. Glick also testified that based on S.K.'s medical records, the respondents had been offered assistance in obtaining the proper nutrition-based medications and pancreatic enzyme. As Dr. Glick testified:

> "There were, I have to say to summarize there were multiple, multiple
>
> interventions that were offered. The most important was ensuring the pancreatic
>
> enzyme. That's very important for [S.K.'s] body to be able to absorb nutrients as

5

well as the vitamins; particularly A, D, E and K. Those are the four vitamins that are fat soluble that are malabsorbed.

I know that we had documentation very clearly that they had offered-- there is an assistance program so that if you get the enzyme and you turn in your receipts you get reimbursed, and there is a whole bunch of different agencies to apply [to] ensure getting the proper nutrition-based medications, and there was a truly [*sic*] lack of follow through by the family; particularly with the enzyme \*\*\*."

Dr. Glick finally testified that at the end of her assessment, based on her review of S.K.'s medical records and her discussions with S.K.'s treating team, she agreed with Dr. Lester that it was reasonable to file a complaint with DCFS because S.K. was suffering from medical neglect and was not provided appropriate medical care on a daily basis.

On cross-examination by the guardian *ad litem*, representing the minor, Dr. Glick testified that the medical records indicated that during his hospital stays in January 2005 and July 2005, S.K. had gained weight and had exhibited lung function improvement. Dr. Glick also testified that after his release from the hospital in January 2005, S.K. missed four medical appointments.

On cross-examination by counsel for the respondent father, Dr. Glick also testified that although she did not review every single page of S.K.'s medical records, she had spent hundreds of hours reviewing them, and had attempted to independently verify and corroborate the information she had received.

Nos. 1-06-2135 & 1-06-2061 cons.

When questioned about the apparent increase in S.K.'s weight indicated by his admission and discharge summaries for hospitalizations in January 2005 and July 2005,[2] Dr. Glick stated that discharge and admission summaries are often written by residents, do not necessarily have accurate weights, and are not reliable data points. In fact, according to Dr. Glick, they are "notoriously incorrect." Accordingly, Dr. Glick testified that for a reliable and accurate review of S.K.'s weight, she had used Dr. Lester's growth chart, which was opened when S.K. was born.

Dr. Glick further testified on cross-examination that S.K. was admitted to the hospital on July 20, 2005, because he was spitting up blood and coughing constantly for a week. Dr. Glick acknowledged that S.K.'s medical records indicated that on July 13, 2005, one of the respondents had taken the minor to see Dr. Lester, and that S.K. was prescribed Cipro. Dr. Glick, however, went on to state that this fact did not change her opinion that S.K. was medically neglected.

Dr. Glick finally testified that, at the time of the adjudicatory hearing, S.K. was in the hospital because he had "a fever and exacerbation, and needed antibiotics." Dr. Glick stated, however, that she had just visited S.K. in the hospital, that he was gaining weight and "doing very well with his disease."

On cross-examination by counsel for the respondent mother, Dr. Glick also testified that

---

[2]The discharge summary for S. K.'s hospitalization in January 2005, part of People's Exhibit No. 1, states that S.K.'s weight on admission was 43.7 kg. The discharge summary of S.K.'s hospitalization in July 2005, states that upon admission to the hospital in July 2005, S.K.'s weight was 46 kg. Both discharge summaries were written by residents.

7

in assessing S.K.'s case, she never spoke to the respondent mother because numerous people had done so in the past.

On redirect examination, Dr. Glick testified that in a case of a discrepancy between a medical record and information from the treating physician, she gives more weight to the treating physicians's original files, and that she had done so in S.K.'s case. In conclusion, Dr. Glick testified that in her opinion S.K. was at risk if he went back home to his parents.

Thomas White, a child protective specialist with DCFS, next testified that he was assigned to investigate allegations of medical neglect and inadequate food at the respondents' home. During his investigation, White first visited S.K. in the hospital. On July 26, 2005, White also visited the mother. White noticed that her home was cluttered but not filthy. He further stated that although he found food in the house, it was not the kind of food that a child could easily eat because it would require a lot of preparation, and "assistance of someone like a mother or a caretaker to actually prepare [this kind of] food for him." More specifically, White indicated that he failed to find any "happy food," which a child in S. K's condition "would just get up and fix for himself."

White further testified that the mother denied having been neglectful, and stated that on the advice of Dr. Lester she had turned over to S.K. the responsibility of taking his own medication, supplements, and food. The mother explained that she wished to make S.K. more independent. With regard to food, the mother stated that the father was not giving her money to purchase necessary food items, and that she was considering taking him to court to compel support. White also testified that at the time of the interview, the father had not been residing

with the mother for approximately one month. During the interview, the mother expressed her belief that "her husband and her sister were setting her up by calling" DCFS. White further testified that he questioned the mother about substance abuse, and that she replied that she was taking diet pills and "that was the only thing she was taking." The mother also stated that she had not drunk alcohol in 10 or 15 years.

White also testified that around August 2, 2005, he interviewed the father, who told him that the mother may be using some type of drugs. The father also told White that he did not think that the mother was giving S. K proper care and that S.K. "might be better off" living with his sister, who was married to a doctor in Wisconsin and who was willing to allow S. K to live in her home for two to three weeks. According to White, the mother rejected this plan, and the father's efforts in that regard failed.

The father also told White that he had been "put out" of the family home, that he did not have a permanent residence, that he worked 80 hours a week, and that there had been an order of protection initiated by the mother against him that barred him from seeing his children. Accordingly, he told White that he "could not be there" to provide the care S.K. needed.

According to White, at the conclusion of his investigation, he "indicated" S.K.'s case for medical neglect, but found the charges of inadequate food unfounded. White explained that "indicating a case" meant that DCFS found it had credible evidence that if the situation was not corrected, the child would be at risk of harm.

On cross-examination by the respondent father, White stated that the evidence that led DCFS to indicate the case for medical neglect was information by Drs. Glick and Lester and

9

other UCH staff, as well as medical reports, indicating that S.K. had not been eating properly, or taking his supplements regularly, and that as a result he had lost 12 pounds, 6 of which he regained once he was readmitted to the hospital.

On cross-examination, White stated that in his investigation of the inadequate food issue, he simply looked into the cupboards to see if there was food that was sufficient to sustain life for that day, and was not looking to find any special food items. White testified that he observed food in the house that was sufficient to feed a family. White also defined "happy food" as a "hot dog [or] pizza," but admitted that he had "no medical opinion" of whether either of these was nutritionally adequate for S.K.

On cross-examination by the respondent mother, White testified that the mother rejected the father's plan because it would have involved S.K. moving out of state to live with the father's, and not with her, relatives.

During the adjudicatory hearing, the State also moved and was permitted without objection to admit People's Exhibit No. 1, 1,470 pages of certified and delegated medical records from UCH made in the course of S.K.'s treatment. The State drew the court's attention to discharge summaries dated August 5, 2005, January 14, 2005, June 28, 1999, December 15, 1998, and August 20, 1996; the Multi-disciplinary Pediatric Education and Evaluation Consortium (MPEEC) report; social service notes dated July 21, 2005, and August 4, 2005; and a social work note and assessment dated November 15, 2004. The State then rested.

The guardian *ad litem*, on behalf of S.K., was allowed to publish from the medical records. The record reflecting S.K.'s admission to the hospital on July 20, 2005, showed that the

10

Nos. 1-06-2135 & 1-06-2061 cons.

"Complaints on Admission and Pertinent History" read in part "significant 5 pound weight loss in the last three months."[3] A social history from the same document stated that S.K.'s "social environment contribute[d] dramatically to his poor health. *** There is rarely enough food in the house, and, therefore, he is malnourished. He receives little supervision to guarantee that he gets his medications." The document further indicated that after respiratory therapy, S.K. "significantly improved *** which was a signal of noncompliance at home." The record further showed that S.K. was admitted with a weight of 46 kg and within two days had gone up to 48.9 kg, which he maintained until discharge.

Similarly, a social work note in S.K.'s Patient Record dated July 21, 2005, indicated:

"During [S.K.'s] previous [UCH] hospitalization, his lung function improved and he gained weight. Over the last three months (since he was last seen by Dr. Lester), his lung function has decreased again and he has lost five pounds. Other concerns involve the home situation/environment. *** Aunt has provided food to S.K. and his brother and they know they can go down to her house when needed (which they have done)."

Another "Social Service Note" referring to the same hospitalization, and dated August 4, 2005, stated:

"Home: [S.K.] understands that DCFS was contacted and that his home situation, including his mother's parenting skills, are being evaluated. [S.K.] appears to agree with concerns about mother's parenting abilities and his living environment.

_____

[3] The transcript incorrectly states that the history reads "significant 45 [lb.] weight loss."

11

> He describes his mother as being 'not responsible,' 'not like a normal mom.' ***
>
> He further reports that she sleeps during the day and is believed to take 'diet
>
> pills.' [S.K.] also reports that the household often lacks food."[4]

The guardian *ad litem* also published from S.K.'s hospital discharge summary of January 14, 2005. That summary included the following: "*** it was determined that [S.K.] needed to be admitted for IV antibiotics due to non-adherence [to his medication regimen]." In the same discharge summary, problem number three reads as: "Social. *** [A] social worker, followed and coordinated a family meeting. A family meeting was arranged and the importance of the patient's medication regimen was again addressed with the family."

After the guardian *ad litem* rested, counsel for the respondent father opened his case in chief by asking the trial court to introduce into evidence the portion of Dr. Glick's testimony

---

[4]Beyond the portion published by the guardian *ad litem*, the note additionally stated that S.K. felt that his home was "unlivable," and that these concerns had started to escalate the previous summer. The note further stated that S.K. had recently graduated from eighth grade, but did not look forward to high school, because he had very few friendships and had no one to turn to for support. S.K. stated that his grades had diminished greatly in the previous year because his attendance record was "so bad." S.K. further stated that he felt overwhelmed with decisions that he felt too young to be making. S.K. also reported that his mother was discouraging him from divulging too much about his family life. The note also pointed out that throughout the interview, S.K. never smiled or laughed, and that he had a "flat affect and at times appear[ed] angry."

concerning S. K's current hospitalization. Counsel argued that during the adjudicatory hearing, he had learned that S.K. was back in the hospital even though he was in the custody of foster parents, who "everyone would agree" had given S.K. "optimum medical care." Counsel argued that the present hospitalization was relevant because it showed that even with such optimal care S.K. could get ill and be rehospitalized. Counsel asked for leave of court and for time to brief this issue. Permission to do so was denied on the grounds of relevance.

In denying the request, the court specifically noted that the fact that S.K. was hospitalized was already in evidence, and that "this petition was not filed because S.K. ended up in the hospital," but because he was not getting the appropriate care in the respondents' home. The trial court explained the standard of care:

"[T]here's no petition against the [foster parents,] that –we don't measure it against care for [foster parents]. We measure it against the standard of care that was appropriate for [S.K.] at that time. [Foster parents] may be the greatest caretakers or mediocre caretakers or marginal caretakers. That's not relevant."

The trial also court pointed out that "the fact that S. K's cystic fibrosis is not resolved is not only irrelevant, it's completely expected," and that it was not in S. K's interest or the father's interest to delay the adjudication.

The father respondent then requested a five-minute recess to decide whether or not to testify, and the trial court instructed him to use the recess to decide whether he wanted to add something to his prior request to brief the issue of S.K.'s post-foster-care hospitalization for purposes of an offer of proof so that the record on this issue was preserved. After that recess the

13

Nos. 1-06-2135 & 1-06-2061 cons.

following colloquy occurred:

> "THE COURT: First of all, relative–is there anything else relative to your offer of proof that you want to say relative to your request to put in evidence as to [S.K.'s] recent hospitalization. Anything further you want to say in reference to that?
>
> MR. NAGELBERG:[5] I can't make an offer of proof because I would need to investigate more further [*sic*] some of the facts behind the hospitalization. It only became known to me the day before the trial started."

The father respondent then requested a continuance to allow him to investigate S.K.'s recent hospitalization so that he could make an offer of proof, and the court denied his request. Throughout the discussion of this issue, counsel for the respondent mother expressed no position or argument. Neither of the respondents presented further evidence.

At the close of the adjudicatory hearing, the trial court found that the State had proved by a preponderance of the evidence that both of the respondents had neglected S.K. when they withheld from him the requisite medical care to battle his cystic fibrosis and when they created for him an injurious environment. The court indicated that in coming to this conclusion it had relied on the testimony of Dr. Glick, whom the court found to be a credible witness, and on S. K's medical records. According to the court, the worsening of S.K.'s cystic fibrosis condition was the direct result of his parents "sub-optimal, inconsistent approach" to his medical care. The court further declined to make a finding of abuse, which would have been predicated upon

---

[5]Counsel for the respondent father.

14

subjecting the child to a substantial risk of injury, because there were "many things that [the parents] did right," including, *inter alia*, "sticking with" the UC hospitals, seeking a prescription for Cipro, and getting S.K. hospitalized in July 2005.

On June 27, 2006, at the beginning of the dispositional hearing, the trial court noted that S.K. wished to address the court in chambers. The court and counsel participated in this *in camera* discussion, and afterward, the court summarized for everyone the concerns that S.K. had raised. According to the trial court, S.K. was frustrated by the length of time his case had taken without any real changes or progress on his parents' part. S.K. felt that he had been "working very hard *** to try to make things better and that [his parents were] not getting that." Additionally, the court noted that *in camera* everyone had agreed that "family therapy should really [be] put in place, sooner rather than later; because there [were] a lot of family dynamic issues that need[ed] to be addressed, and [S.K.] need[ed] a place [where] he c[ould] talk to the parents about their behavior, in a setting that fe[lt] safe."

The State then called caseworker Matt Gerber, of Luther Social Services of Illinois, who testified that he was assigned to S.K.'s case on June 7, 2006. Gerber assessed both of the respondents for services, and recommended that the mother partake in a drug assessment, sign up for individual counseling, and "keep up with S.K.'s medical appointments." According to Gerber, the mother's substance abuse test showed that she did not need drug treatment. As far as counseling, Gerber testified that the mother had consistently been attending her weekly sessions. With regard to responsibility for S. K's care, she had maintained regular contact with the caseworker and the agency, and participated in unsupervised weekly visits with her son, during

15

which no unusual incident had been reported. However, the mother continued to miss S.K.'s medical appointments. According to Gerber, her overall rating was nevertheless satisfactory.

In assessing the respondent father, Gerber recommended that he sign up for individual therapy, a drug assessment and domestic violence screening, and that he regularly attend S.K.'s medical appointments. Following these tests, Gerber determined that the father did not require any drug or alcohol treatment or domestic violence counseling. Gerber further testified that although the father regularly participated in his individual counseling sessions, he failed to attend some of S.K.'s medical appointments.

Gerber further testified that S.K. was currently living with his maternal aunt. Gerber had visited the aunt's home and found it to be safe and appropriate. According to Gerber, the aunt was meeting all of S.K.'s special medical needs, including attending all of S.K.'s doctors' appointments consistently and making sure that S.K. took his medication and received his chest treatment on a daily basis.

Gerber also stated that he had reviewed reports from S.K.'s doctors which showed that the minor was experiencing "normal flare-ups." These reports also showed that S.K. was gaining and maintaining weight satisfactorily and receiving his medication and treatment as required. According to Gerber, based on all this information, the agency's recommendation was that a legal guardian be appointed for S.K., with an ultimate goal of returning him home.

In closing argument, the State requested that S.K. be adjudged a ward of the court and that DCFS be appointed his legal guardian. The guardian *ad litem* also asked that the

permanency goal be set at "return home." Counsel for the respondent father asked for a finding that the respondent father was unable to care for S.K., as he was overwhelmed with his own problems, including financially supporting the family. Counsel for the respondent mother expressed agreement with the recommendations of the State.

At the end of the dispositional hearing, the trial court adjudicated S.K. a ward of the court and found that both of the respondents were unable for some reason other than financial circumstances alone to care for, protect, train or discipline S.K. The trial court found that reasonable efforts for family preservation had been made but were unsuccessful and appointed DCFS as S.K.'s guardian.[6]

With the agreement of all the parties, the court entered a permanency order setting the permanency goal for S.K. as "return home within 12 months." This goal was set because the court found that the "[p]arents [were] visiting [S.K.] regularly and [were] in services," even though the "[m]other [was] not consistent with therapy [and] [n]either parent regularly participate[ed] in medical visits." The trial court also found that the respondent mother had made "some progress," while the respondent father had made "substantial progress" toward S.K.'s return home. Respondents now appeal.

## II. ANALYSIS

### 1. Trial Court's Finding of Medical Neglect

#### A. Adjudicatory Hearing

The respondent mother first argues that the evidence presented at the adjudicatory hearing

---

[6]According to DCFS, S.K. would continue to reside in foster care with his maternal aunt.

17

did not support the conclusion that S.K. was medically neglected. She specifically asserts (1) that S.K. complied with his medication requirements; (2) that the hospital records did not show that S.K. needed to abide by a special diet at home; (3) that there was no documentation that a medical appointment was missed; (4) that prior to his hospitalization, S.K. was taken to the doctor and prescribed Cipro, and therefore the respondents did comply with his medical needs; and (5) that allegations of S.K.'s weight loss were unfounded because Dr. Glick testified that weight evaluations on admission records and discharge summaries are "erroneous" and "notoriously incorrect." Both the State and the public guardian contend that there was ample evidence to support the trial court's findings. We agree.

Whenever a petition for adjudication of wardship is brought under the Juvenile Court Act of 1978, the "'best interests of the child is the paramount consideration.'" In re F.S., 347 Ill. App. 3d 55, 62, 806 N.E.2d 1087, 1093 (2004), quoting In re K.G., 288 Ill. App. 3d 728, 734-35, 682 N.E.2d 95, 99 (1997). Following the filing of a petition for wardship, the State must prove abuse or neglect by a preponderance of the evidence. 705 ILCS 405/1-3(1), 2-21 (West 2002); F.S., 347 Ill. App. 3d at 62, 806 N.E.2d at 1093. "Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not." K.G., 288 Ill. App. 3d at 735, 682 N.E.2d at 99.

The trial court is afforded broad discretion when determining whether a child has been abused or neglected within the meaning of the Act, and this court will not disturb the trial court's findings unless they are against the manifest weight of the evidence. F.S., 347 Ill. App. 3d at 62-63, 806 N.E.2d at 1093. "A trial court's finding is against the manifest weight of the evidence if

review of the record clearly demonstrates that the opposite result would be the proper one." K.G., 288 Ill. App. 3d at 735, 682 N.E.2d at 99.  Because the trial court has the best opportunity to observe the demeanor and conduct of the parties and witnesses, it is in the best position to determine the credibility and weight to be given to the witnesses' testimony.  F.S., 347 Ill. App. 3d at 63, 806 N.E.2d at 1093.

Neglect is generally defined as the failure to exercise the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duty.  In re Arthur H., 212 Ill. 2d 441, 463, 819 N.E.2d 734, 746 (2004).  Pursuant to section 2-3(1)(a) of the Act, a neglected minor includes "any minor under 18 years of age who is not receiving the proper or necessary support, education as required by law, or *medical* or other remedial care recognized under State law as necessary for [his] well-being." (Emphasis added.)  705 ILCS 405/2-3(1)(a) (West 2002).  Illinois courts have held that a child who does not receive appropriate medical evaluations or care is neglected.  See In re N., 309 Ill. App. 3d 996, 999-1000, 1007-08, 723 N.E.2d 678, 680, 685-86 (1999) (the trial court's finding of medical neglect for a premature infant, was upheld where parents had not followed up on various medical evaluations, even though none of the appointments concerned life-threatening conditions, but were necessary for the infant's well-being and the infant's condition had the potential to create lifelong problems).  However, because our courts have recognized that the concept of neglect has no fixed meaning, cases adjudicating neglect are *sui generis* and must be decided on the basis of their own particular facts.  F.S., 347 Ill. App. 3d at 63, 806 N.E.2d at 1093.

In the present case, the unrebutted testimony of Dr. Glick and the evidence contained in

Nos. 1-06-2135 & 1-06-2061 cons.

S.K.'s medical records amply support the trial court's conclusion that S.K. was neglected as a result of the respondent's failure to provide him with necessary medical care. The evidence presented at the adjudicatory hearing showed that S.K. was diagnosed with cystic fibrosis shortly after birth and had been battling the disease for nearly 14 years. Dr. Glick's testimony established that proper care for a patient with this disease, included a regimented schedule of daily medication, regular physical therapy, and a nutritious diet, including the intake of specific enzymes, which would decrease the likelihood of weight loss. Dr. Glick's testimony further established that despite the fact that S.K. had been admitted to UCH on numerous occasions and numerous efforts were made by UCH staff to educate the respondents about the disease, both of the parents consistently missed S.K.'s medical appointments, failed to comply with Dr. Lester's treatment suggestions, and neglected to utilize programs that would have provided them with subsidized nutritional supplements, including the necessary pancreatic enzyme. Dr. Glick also testified that as a result of the respondents' persistent noncompliance, S.K. consistently failed to gain necessary weight and upon admission to the hospital in July 2005 was found to be "chronically malnourished."[7]

Moreover, Dr. Glick's conclusions are well supported by S.K.'s medical records, which indicate that as early as 1996, S.K.'s treating physicians expressed concerns about S.K.'s failing health due to inconsistent and inadequate medical care. Notes from August 8, 1996 indicate "concern re: home situation include *** noncompliance with medications, *** canceling

[7]Dr. Glick also testified that upon admission to the hospital, S.K. experienced a significant weight gain.

20

counseling sessions." Similarly, records from August 20, 1996, establish that both of the respondents were educated about cystic fibrosis treatment and the importance of cystic fibrosis management.

The record dated September 29, 2003, reflects S.K.'s visit to his doctor and several concerns by the doctor arising from that visit, including that S.K. "is not getting his airway clearance on a regular basis, as the household is somewhat chaotic"; that the respondent mother gave S.K. "cough medicine *** with his recent illness, which is definitely not recommended in cystic fibrosis where the point should be to get him to expectorate the sputum"; and that S.K. lost "five pounds in the last six months." This record also confirms that S.K. "has not been able to get high calorie supplement[] *** because the family has not done the necessary paperwork to obtain these for free, which is offered to cystic fibrosis patients."

Finally, the record from S.K.'s January 2005 hospital admission shows that S.K. was admitted for "intravenous antibiotics" because "there [was] questionable adherence to S. K's medication regimen as well [as] his family's compliance with the medication regimen." Records from S.K.'s July 2005 hospitalization indicate that S.K. had a "5 pound weight loss in the last three months," and that "[t]he patient's social environment contributes dramatically to his poor health. *** There is rarely enough food in the house and, therefore, he is malnourished. He receives little supervision to guarantee that he gets his medications ***."

We also note that neither of the respondents presented any evidence in his or her respective case in chief to rebut the testimony of Dr. Glick and the extensive medical records introduced at trial. Accordingly, the circuit court properly relied upon the expert's medical

21

testimony in reaching its conclusion that both of the respondents medically neglected S.K.  See

In re Ashley K., 212 Ill. App. 3d 849, 890, 571 N.E.2d 905, 930 (1991) ("The circuit court

cannot disregard expert medical testimony that is not countervailed by other competent medical

testimony or medical evidence" or "second-guess medical experts." "If the circuit court does not

follow medical evidence that is not refuted by other medical evidence, the [court] is acting

contrary to the evidence"); F.S., 347 Ill. App. 3d at 64, 806 N.E.2d at 1094 (the trial court has no

authority to disregard undisputed medical testimony).

The respondent mother next contends that the petition for adjudication of wardship

should be dismissed because under Illinois law she had no duty to follow the specific treatment

plan recommended by UCH, but only to provide proper medical care for her child.  The State

contends that the respondent mother has waived this issue because she has failed to properly

preserve it for review.  We agree.

We first note that the respondent mother has waived this issue for purposes of appeal

because she did not raise this issue at the trial level.  See People v. Primm, 319 Ill. App. 3d 411,

423, 745 N.E.2d 13, 25 (2000); see also In re April C., 326 Ill. App. 3d 225, 242, 760 N.E.2d 85,

98 (2001) ("Where a party fails to make an appropriate objection in the court below, he or she

has failed to preserve the question for review and the issue is waived").  In the instant case, the

issue of whether the respondent mother had a parental duty to obey the treatment plans and

recommendations of S.K.'s medical team was never raised at the trial level.

Waiver aside, we find that the respondent mother cannot prevail with this contention

because it has no bearing on the outcome of her case.  Under section 2-3(1)(a) of the Act, a

neglected minor is "any minor *** who is not receiving the proper or necessary *** *medical* *** care recognized under State law as necessary for his well-being." (Emphasis added.) 705 ILCS 405/2-3(1)(a) (West 2002). The respondent mother argues that it would be unwise for us to presume that any medical care or treatment recommended by S.K.'s physicians at UCH is *per se* correct because it would ultimately compromise the rights of patients. She further alleges that there are "signs *** that [S.K.] received imperfect care" at UCH because it was unclear whether UCH staff knew that S.K. had gained or lost weight, and cites to Mink v. University of Chicago, 460 F. Supp. 713, 718 (N.D. Ill., 1978), for the proposition that UCH treatment plans are unreliable.

However, under the facts of this case, there is no need for us to deal with the respondent mother's attempt to determine whether Illinois law mandates total submission to the recommendations of treating physicians since at the adjudicatory hearing neither of the respondents introduced any evidence of alternative medical advice or recommendations. Moreover, neither of the respondents offered expert testimony refuting Dr. Glick's description of the general care and treatment offered to cystic fibrosis patients or indicating that the treatment plan recommended by UCH was inappropriate for S.K.'s condition. Finally, the respondents did not testify that they disagreed with the health care providers at UCH or that they had sought a second opinion. Accordingly, the treatment provided and recommended for S.K. by UCH was the only relevant treatment plan and the only one that the trial court could properly consider. See In re Marcus H., 297 Ill. App. 3d 1089, 1096-97, 697 N.E.2d 862, 866-67 (1998), quoting Ashley K., 212 Ill. App. 3d at 890 ("'the circuit court *** cannot second-guess medical experts. If the

23

Nos. 1-06-2135 & 1-06-2061 cons.

circuit court does not follow [expert] medical evidence that is not refuted by other medical evidence, the circuit court is acting contrary to the evidence'").

Moreover we find that <u>Mink</u>, 460 F. Supp. at 718, cited by the respondent mother has absolutely no bearing on the case at bar. In <u>Mink</u>, a class of women sued UCH because without knowledge or consent, each woman received an experimental treatment at the hospital as part of her prenatal care, ultimately resulting in harm to her baby. In reversing the district court's motion to dismiss the plaintiff's battery action, that court noted that the administration of the drug to the patients was clearly intentional and part of a planned experiment conducted by defendants. <u>Mink</u>, 460 F. Supp. at 718. Unlike <u>Mink</u>, in the case at bar, there were no allegations presented at the adjudicatory hearing that the treatment initiated by UCH was inappropriate or harmful to S.K. Moreover, there is absolutely no evidence in this case that UCH staff performed any treatment on S.K. without the knowledge or consent of the respondents, much less that such a treatment was "experimental."

B. Disposition Hearing

The respondent mother next contends that the evidence presented to the trial court did not support its findings that she was unable for some reason other than financial circumstances alone to care for, protect, train or discipline S.K., and that services aimed at family preservation were unsuccessful. The State contends that the respondent mother is precluded from attacking the trial court's finding at the disposition hearing. The State specifically argues that the respondent mother failed to specify in her the notice of appeal that she wished to appeal both the adjudicatory and the dispositional orders, and that therefore this court lacks jurisdiction to

24

Nos. 1-06-2135 & 1-06-2061 cons.

consider her claim. We disagree.

"The purpose of the notice of appeal is to inform the prevailing party that the unsuccessful party has requested review of the judgment complained of and is seeking relief from it." F.S., 347 Ill. App. 3d at 68, 806 N.E.2d at 1097. As such, Supreme Court Rule 303(b) states that a notice of appeal "shall specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court." 155 Ill. 2d R. 303(b)(2). Because notices of appeal are generally to be construed liberally (Daniels v. Anderson, 162 Ill. 2d 47, 62, 642 N.E.2d 128, 135 (1994); Waste Management, Inc. v. International Surplus Lines Insurance Co., 144 Ill. 2d 178, 188-89, 579 N.E.2d 322, 326 (1991)), the failure to specify a particular order in a notice of appeal does not preclude our review of that order "so long as the order that is specified *directly relates back to* the judgment or order from which review is sought" (emphasis added) (Perry v. Minor, 319 Ill. App. 3d 703, 709, 745 N.E.2d 113, 118 (2001)). With regard to child abuse and neglect cases, we have held that an adjudication order cannot directly relate back to the disposition order because the adjudication order preceded the disposition order. F.S., 347 Ill. App. 3d at 69, 806 N.E.2d at 1098.

In the present case, the State argues that the notice of appeal filed by the respondent mother shows only that she is appealing from the trial court's finding of neglect made at the adjudication hearing. We disagree. The respondent mother's notice reads:

"An appeal is taken from the order or judgment described below:

***

25

Nos. 1-06-2135 & 1-06-2061 cons.

JUDGMENT: *** Finding after an adjudicatory hearing of neglect.

***

DATE OF JUDGMENT:   5/23/06 & 6/27/06 Dispo.

When read liberally, the handwritten marking "6/27/06 Dispo.," adequately indicates that the respondent mother wished to appeal both the adjudicatory order entered on May 23, 2006, and the dispositional hearing order entered on June 27, 2006.  This is especially true, when the marking is read in context of a standardized notice of appeal form, such as the one used in this case, which requires the appellant to check off appropriate boxes, none of which explicitly indicates an "appeal from a dispositional hearing."  As we have jurisdiction to review the respondent mother's claim, we proceed to the merits.

The public guardian alternatively argues that the respondent mother is estopped from challenging the trial court's finding at the dispositional hearing because at that hearing, her counsel expressed agreement with the recommendations of the State that S.K. be made a ward of the court and that DCFS be appointed his legal guardian.  We agree.  A party is estopped from taking a position on appeal that is inconsistent with a position the party took in the trial court.  See In re E.S., 324 Ill. App. 3d 661, 670, 756 N.E.2d 422, 429-30 (2001).

Waiver aside, however, we would find that the respondent mother's challenge to the dispositional order is without merit.  "Pursuant to section 2-27 of the [Act,] a minor may be adjudged a ward of the court and custody taken away from the parents where it is determined that the parents are either unfit or unable, for some reason other than financial circumstances alone, to

26

Nos. 1-06-2135 & 1-06-2061 cons.

care for, protect, train or discipline a minor or are unwilling to do so." In re April C., 326 Ill. App. 3d at 256, 760 N.E.2d at 110, citing 705 ILCS 405/2-27(1) (West 2002). "The standard of proof in a trial court's section 2-27 finding of unfitness that does not result in a complete termination of all parental rights is [the] preponderance of the evidence." April C., 326 Ill. App. 3d at 257, 760 N.E.2d at 110. "On review, the trial court's determination will be reversed only if the findings of fact are against the manifest weight of the evidence or if the trial court committed an abuse of discretion by selecting an inappropriate dispositional order." In re T.B., 215 Ill. App. 3d 1059, 1062, 574 N.E.2d 893, 896 (1991). A finding is against the manifest weight of the evidence where a review of the record clearly demonstrates that the result opposite to that reached by the trial court was the proper result. T.B., 215 Ill. App. 3d at 1062, 574 N.E.2d at 896. Because the trial court is in a superior position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the trial court's findings merely because the reviewing court may have reached a different decision. April C., 326 Ill. App. 3d at 257, 760 N.E.2d at 110.

In the present case, there was ample evidence presented at the disposition hearing for the trial court to find that the respondent mother was unable to care for S.K. Although we agree that the record indicated that the respondent mother was cooperative in completing the services recommended by DCFS, by passing her drug test and attending her counseling sessions, the evidence nevertheless showed that she continued to miss S.K.'s scheduled medical appointments, an action that the trial court had relied on in finding her neglectful in the first place.

Moreover, we agree with the guardian *ad litem* that the purpose of the dispositional

27

Nos. 1-06-2135 & 1-06-2061 cons.

hearing is for the court to determine whether it was in the best interest of S.K. to be made a ward of the court. In re Edward T., 343 Ill. App. 3d 778, 800, 799 N.E.2d 304, 321 (2003); see also In re J. J., 327 Ill. App. 3d 70, 77, 761 N.E.2d 1249, 1255 (2001) (child's best interests are superior to all other factors even if the parent is not found to be unfit). The evidence presented by the caseworker showed that S.K. was presently living with his maternal aunt, and that the aunt's home was safe and appropriate. The caseworker also testified that the aunt's home met all of S.K.'s special medical needs, including regularly attending doctor's appointments, and receiving medication and physical therapy on a daily basis. Because the court was not limited only to considering the respondent's compliance with DCFS service plans (Edward T., 343 Ill. App. 3d at 800, 799 N.E.2d at 321), we find that it properly ruled that it was in the best interest of S.K. to be placed in the guardianship of DCFS and remain with his foster aunt.

### 2. Evidence of S.K.'s Hospitalization While In Foster Care

Both of the respondents next argue that the trial court improperly barred the introduction of evidence of care given to S.K. after he was removed from their home and while living in foster care. Although only the respondent father moved for the introduction of such evidence at the adjudicatory hearing, on appeal, the respondent mother argues that this evidence should have been admitted by the trial court as to her case "*sua sponte*," because its admission would have protected her constitutional rights and afforded her an opportunity to demonstrate that her care of S.K. was lawful and adequate. The respondent father similarly argues that he was substantially prejudiced by the court's refusal to admit this evidence at the adjudicatory hearing because it would have established that cystic fibrosis manifests the need for emergency intervention

28

independent of and not related to the quality or consistency of care administered by the respondents, and could occur even in circumstances which the court considered to be "optimal care."

As to the respondent father, we first note that he has waived this issue for purposes of appeal because he has failed to present an offer of proof. Generally, a party who fails to make an offer of proof as to evidence it intended to introduce at trial and which was excluded, waives any challenge with respect to that evidence. In re Jaron Z., 348 Ill. App. 3d 239, 258, 810 N.E.2d 108, 124 (2004). In the present case, the record shows that the respondent father attempted to introduce into evidence a portion of Dr. Glick's testimony indicating that S.K. was hospitalized while he was in the custody of his foster parents, and asked for a chance to brief this issue. He also asked to introduce testimony as to what kind of care S.K. was receiving while in the custody of the foster parents. The trial court denied this request and instructed the father respondent to use a five minute recess to decide whether he wanted to add anything to his request for purposes of an offer of proof so that the record on this issue was preserved. After that recess the following colloquy occurred:

> "THE COURT: ***[I]s there anything else relative to your offer of proof
>
> that you want to say relative to your request to put in evidence as to [S.K.'s]
>
> recent hospitalization. Anything further you want to say in reference to that?
>
> MR. NAGELBERG:[8]  I can't make an offer of proof because I would need

---

[8]Counsel for father respondent.

Nos. 1-06-2135 & 1-06-2061 cons.

to investigate more further [*sic*] some of the facts behind the hospitalization."

Although the respondent father subsequently made no offer of proof, he nevertheless contends that he should have been given more time to investigate S.K.'s hospitalization in order to make an offer of proof, as this would have established the materiality of this evidence and allowed him to proceed with it at the adjudicatory hearing. The guardian *at litem* contends that the circuit court did not err in denying the father respondent's request for a continuance. We agree.

Our courts have long recognized that there is no absolute right to a continuance. In re D.P., 327 Ill. App. 3d 153, 158, 763 N.E.2d 351, 355 (2001). Because Illinois recognizes that "serious delay in the adjudication of abuse, neglect, or dependancy cases can cause grave harm to the minor" (705 ILCS 405/2-14 (West 2002)), "[i]t is within the juvenile court's discretion whether to grant or deny a continuance motion and the court's decision will not be disturbed absent manifest abuse or palpable injustice." In re K.O., 336 Ill. App. 3d 98, 104, 782 N.E.2d 835, 841 (2002). "The denial of a request for continuance is not a ground for reversal unless the complaining party has been prejudiced by such denial." K.O., 336 Ill. App. 3d at 104, 782 N.E.2d at 841.

Under section 2-1007 of the Illinois Code of Civil Procedure "[o]n good cause shown, in the discretion of the court and on just terms, additional time may be granted for the doing of any act or the taking of any step or proceeding prior to judgment." 735 ILCS 5/2-1007 (West 2000). Continuances in juvenile cases may be granted upon "written motion of a party filed no later than 10 days prior to hearing, or upon the court's own motion and only for good cause shown." 705

30

Nos. 1-06-2135 & 1-06-2061 cons.

ILCS 405/2-14(c) (West 2000). "The term 'good cause' as applied in the Juvenile Court Act of 1987 [citation] is strictly construed and must be in accordance with Supreme Court Rules 231(a) through (f)." K.O., 336 Ill. App. 3d at 104, 782 N.E.2d at 841; 705 ILCS 405/2-14(c) (West 2000); 134 Ill. 2d Rs. 231(a) through (f). As a result, the court may continue the hearing "only if the continuance is consistent with the health, safety and best interests of the minor." 705 ILCS 405/2-14(c) (West 2002).

In the instant case, the respondent father moved for a continuance in the middle of the adjudication hearing, not 10 days in advance as required by statute (705 ILCS 405/2-14(c) (West 2002)), even though he became aware of S.K.'s hospitalization a day before the adjudicatory hearing. Moreover, the father respondent failed to show good cause for not requesting the continuance earlier. The record shows that the petition for adjudication was filed on August 5, 2005. The adjudicatory hearing began on April 7, 2006, with the introduction of medical records and resumed on April 27, 2006, for the testimony of Dr. Glick. The hearing was then continued again, to May 1, 2006, for the respondents' case in chief. On that date, the respondent father first stated that he had recently discovered that S.K. was hospitalized and that he wanted to put into evidence testimony about the medical care S.K. was receiving in the home of his maternal aunt. When the court invited the respondent father to make an offer of proof, he indicated that he could not make one, as he had learned about the hospitalization one day before Dr. Glick's testimony, on April 26, 2006, and needed more time to investigate. As such, the respondent father had six days from the time he discovered S.K. was hospitalized and the time the adjudicatory hearing resumed on May 1, 2006, to offer an affidavit requesting a continuance and establishing good

31

cause to warrant it. However, the father respondent offered no such affidavit, and failed even to investigate the simple fact of when exactly S.K. had been hospitalized.[9]

However, even if we would not find waiver by reason of his failure to submit an offer of proof, no prejudice would have resulted to the respondent father in barring his introduction of S.K.'s hospitalization during foster care, since that fact was, at best, remotely relevant and could not have changed the outcome of the adjudicatory hearing. The purpose of the adjudicatory hearing is "to determine whether the allegations of a petition **** that a minor *** is *** neglected *** are supported by a preponderance of the evidence." 705 ILCS 405/1-3(1) (West 2002). Under the Act, the rules of evidence in the nature of civil proceedings are applicable to the adjudicatory hearing. 705 ILCS 405/2-18(1) (West 2002). "Whether evidence is admissible is within the discretion of the circuit court, and its ruling will not be reversed absent an abuse of that discretion." In re Kenneth D., 364 Ill. App. 3d 797, 803, 847 N.E.2d 544, 550 (2006). "All evidence must be relevant to be admissible." Kenneth D., 364 Ill. App. 3d at 803, 847 N.E.2d at 550. "Evidence is relevant if it tends to prove a fact in controversy or render a matter in issue more or less probable." Kenneth D., 364 Ill. App. 3d at 803, 847 N.E.2d at 550.

In the present case, the record is sufficient to show how evidence of S.K.'s post-foster-care hospitalization would not have been material to the issue of the respondents' medical neglect. We agree with the trial court's determination that the petition for adjudication of

---

[9]Testimony by the caseworker at the disposition hearing established that S.K. was hospitalized on April 18, 2006, and successfully discharged at some unspecified date.

wardship was not filed because S.K. was hospitalized but rather because of concerns that S.K. was not receiving adequate care at home prior to his hospitalization in July 2005. This petition specifically alleged that S.K. suffered from long-standing medical neglect and chronic malnourishment because the respondents had a long history of marginal medical compliance in his home care. Based on that, there was no reason to delay the proceedings in order to brief this issue. As already noted, the granting of continuances is within the sound discretion of the trial court, and in exercising that discretion, the trial court should take into account that our supreme court has recognized that keeping a minor's status in limbo for an extended period of time is not in the best interest of the child. In re D.L., 191 Ill. 2d 1, 13, 727 N.E.2d 990, 996 (2000). As S.K. was 15 ½ years old at the time of the adjudicatory hearing, and had been taken into protective custody eight months earlier, in August 2005, the circuit court properly recognized the importance of avoiding undue delay and concluded that it was not in the minor's best interest to grant the respondent father's request to brief the issue of S.K.'s post-foster-care hospitalization. Based on the foregoing, the respondent father has failed to demonstrate an abuse of discretion resulting from the trial court's refusal to admit this evidence.

However, even if we were to find that the court abused its discretion by refusing to admit at trial evidence of the minor's hospitalization while in the custody of his foster parents, we would find no reversible error as the respondent father was not prejudiced by this denial. As discussed above, the unrebutted evidence presented at the adjudicatory hearing overwhelmingly supported the trial court's finding of medical neglect. Moreover, the record below clearly establishes that evidence of S.K.'s post-foster-care hospitalization already came into evidence

through the testimony of Dr. Glick. As such, we do not see how further evidence regarding S.K.'s hospitalization could have affected the outcome of the adjudicatory hearing.

As to the respondent mother's claim that the court should have *sua sponte* admitted the evidence of S.K.'s post-foster-care hospitalization, both the State and the guardian *ad litem* contend that she has waived this issue by failing to properly preserve it for appellate review. We agree. As noted, the record below indicates that the respondent mother never proffered any evidence of S.K.'s post-foster-care hospitalization, nor argued or rendered any opinion whatsoever with regard to this matter at the adjudicatory hearing. As such she has waived the issue for purposes of this appeal.

However, waiver aside, even if the court had been obligated to admit this evidence *sua sponte*, for the reasons already discussed with regard to the respondent father's claim, we find no reversible error.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

FITZGERALD SMITH, P.J., and McNULTY, J., concur.