2019 IL App (2d) 190300-U
No. 2-19-0300
Order filed November 7, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In *re* Hannah M., a Minor. | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| | ) | |
| | ) | |
| | ) | Nos. 16-JA-82 |
| | ) | |
| | ) | |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Francis Martinez, |
| Appellee v. Ambra J., Respondent-Appellant). | ) | Judge, Presiding. |

PRESIDING JUSTICE BIRKETT delivered the judgment of the court.
Justices McLaren and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in finding that respondent-mother was an unfit parent for her failure to make reasonable progress during two different nine-month periods where she remained in an abusive relationship with a man who was not related to the child throughout both nine-month periods, failed to successfully attend a majority of her court-ordered services and never moved beyond supervised visits with her daughter. The trial court also did not err in terminating respondent-mother's parental rights to her child when the child had been in a loving foster home with her half-brother for a year-and-a-half at the time of the best interest hearing, the foster parent wished to adopt the child, and the child was bonded with both the foster mother and her half-brother.

¶ 2     Respondent-Appellant Ambra J. (Ambra) appeals the trial court's orders finding her to be an unfit parent and subsequently terminating her parental rights to her daughter, Hannah M. (Hannah).  For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4     The record reflects that on July 9, 2016, Ambra bit her paramour, Darren M. (Darren),[1] while he was driving with seven-month-old Hannah in the car.  Following that incident, the State filed a petition for adjudication on August 11, 2016.  In the petition the State listed Darren as Hannah's legal father and claimed that Hannah was neglected since her environment was injurious to her welfare on the following bases:  (1) Ambra's mental health placed Hannah at risk and Darren failed to protect her; (2) Darren's mental health placed Hannah at risk and Ambra failed to protect her; (3) Ambra's history of substance abuse placed Hannah at risk and Darren failed to protect her; (4) issues of domestic violence in Hannah's home placed her at risk; and (5) Ambra and/or Darren had an open intact Department of Children and Family Services (DCFS) case and had failed to cooperate fully with the recommended agency services, thereby placing Hannah at harm.  705 ILCS 405/2-3(b) (West 2016).  The State also alleged that Hannah was not presently in DCFS' custody and it was in her best interest and that of the public that she be made a ward of the court. Finally, the State requested a temporary shelter care for Hannah.

¶ 5     On the same day the trial court entered a temporary custody order.  In the order it was noted that Ambra and Darren stipulated that an intact case had been opened with DCFS since April 11, 2016, and that a safety plan was in place requiring Darren to supervise Ambra's contact with

---

[1] Darren's name is spelled two different ways throughout the record.  However, there is a form in the record signed by Darren using this spelling so we will use the same spelling.

Hannah due to Ambra's mental health issues. Ambra and Darren admitted to the intact worker's supervisor that they did not follow the safety plan and Ambra was allowed to be unsupervised with Hannah. Around July 9, 2016, Ambra was arrested for domestic battery to Darren and Hannah was present during that incident (the biting incident). Darren had chosen to remain living with Ambra since that incident. Both Ambra and Darren had also not reported multiple police contacts to the intact case manager in a timely manner. Based upon this information the trial court granted DCFS guardianship of Hannah with the power to place her in the appropriate care. On August 26, 2016 Hannah was placed with Jennett M., Darren's mother.

¶ 6    On October 25, 2016, the court adjudicated Hannah a neglected minor due to an injurious environment based upon Ambra and Darren's stipulations to their history of domestic violence, failure to comply with an intact safety plan and Ambra's mental health issues. Ambra was diagnosed with bipolar disorder, generalized anxiety disorder, epilepsy and recurrent seizures.

¶ 7    At a dispositional hearing on November 22, 2016, Ambra admitted that she did not believe that Darren was the biological father of Hannah. The matter was continued to January 10, 2017, for status on Darren's DNA. On that date, the court entered an order excluding Darren as Hannah's biological father. Darren was then excluded from further proceedings in this case. However, Hannah remained living with Jennett, who was then designated as "fictive kin."[2] At that time, Ambra and Darren were still in a relationship and Jennett wished for Hannah to remain with her.

---

[2] "Fictive Kin is a term used to refer to individuals that are unrelated by either birth or marriage, but have an emotionally significant relationship with another individual that would take on the characteristics of a family relationship." https://definitions.uslegal.com/f/fictive-kin/ .

Also living with Jennett were Jennett's niece, Jasmine S. and her husband John C., both of whom reportedly provided a great deal of Hannah's care.

¶ 8    In January 2017 Ambra attempted to stab Darren with a knife during an argument. She then turned the knife on herself. After that incident Ambra was hospitalized and her visitation with Hannah was suspended for several months.

¶ 9    On March 8, 2017, Darren filed a voluntary acknowledgement of paternity even though DNA excluded him as Hannah's biological father. At a dispositional hearing on March 23, 2017, the State alleged that the voluntary acknowledgement of paternity that Darren presented at the last court date was a false pleading when Darren knew that that the results of the DNA excluded him as Hannah's father. Also, the Department of Children and Family Services (DCFS) and Court Appointed Special Advocates (CASA) had raised concerns in their reports about domestic violence between Ambra and Darren, and the State believed that Ambra was possibly coerced into signing that document. The court found that that proceeding was not the proper forum for Darren's voluntary acknowledgement of paternity and that it had not been properly plead or filed appropriately at that time. No one else had come forward claiming to be Hannah's father and her unknown father was found to be unable, unwilling and unfit. The court also found Ambra unfit to care for Hannah. The court noted that Ambra had been assessed for services and needed continued mental health services, including psychotropic medication monitoring and individual therapy. Ambre also needed to engage in domestic violence services and parenting classes, which had not yet begun. Hannah was made a ward of the court and DCFS was appointed her guardian with the right to place her with a responsible relative or in traditional foster care.

¶ 10    On September 6, 2017, the State filed a memorandum in support of a finding that Hannah's current foster home with Jennett was not necessary and appropriate to the plan and goal of

returning Hannah home to Ambra within 12 months. At a permanency hearing the next day the trial court noted that Hannah was almost two years old at that time and living in a home that was designated as "fictive kin." Hannah was receiving developmental, speech and physical therapy services in her daycare. The court found that Ambra had engaged in substance abuse services, individual therapy, group therapy and mental health services. It found that Ambra had made substantial progress in the services she was receiving; she was visiting Hannah consistently and that visitation was going well. However, Ambra had also fallen asleep at a visit with Hannah in June and then tested positively for alcohol. She also admitted to continuing to live with Darren. For those reasons, the court found that Ambra had not made progress on some of her goals. Nevertheless, the trial court denied the State's request to move Hannah from Jennett's home. It agreed with the State that Ambra's toxic relationship with Darren was exacerbated by Hannah being placed with Darren's family. However, the court found that Ambra was specifically choosing to remain in her relationship with Darren that Hannah's placement, in and of itself, appeared to be a nurturing environment to Hannah at that time. In the permanency order of September 7, 2017, the trial court found that Ambra was making reasonable efforts towards Hannah's return, but not reasonable progress. The court again noted that Ambra had tested positive for alcohol in June 2017 after she fell asleep at a visit with Hannah. Ambra also continued to live with Darren in violation of her bail bond requirements. The court found that these issues mirrored those that brought Hannah into care many months ago. The goal remained to return Hannah home within 12 months.

¶ 11    On October 25, 2017, Hannah was moved from Jennett's home to the home where her brother, Jacob, lived. Jacob had been adopted in March 2017 by his foster caregiver. On November 27, 2017, Ambra reported to her Lutheran Social Services (LSSI) caseworker that

Darren was abusive to her. At that time visitations with Hannah were scheduled on Fridays. Ambra had cancelled the last two visits in November 2017. She did not have an excuse for cancelling the visits and she did not request to make them up.

¶ 12  A permanency review hearing was held on December 19, 2017. At the hearing Katy Bray testified that she was the LSSI supervisor assigned to this case. Ambra was currently attending Breaking Free in Aurora for substance abuse counseling. Last month there were three group meetings scheduled and three individual meetings scheduled at Breaking Free, but Ambra had only attended one individual and one group meeting. A worker from Breaking Free called Bray last week and told her that if Ambra was not attending the individual and group counseling sessions they were going to discharge her due to lack of compliance. Ambra started the treatment in April 2017 and she still was at level one for alcohol use. Ambra had also been referred to Mutual Ground in Aurora for victim domestic violence counseling. She was currently on the wait list, but she had not signed the consent form, so the employees at Mutual Ground could not verify to Bray whether she had received any services. Ambra had been ordered to receive services at Mutual Ground since October 2016.

¶ 13  Bray said that although Darren has been determined to not be the biological father of Hannah, since he was still in a relationship with Ambra there was an expectation that he would participate in necessary services. Those services were necessary because Ambra had said that she would parent Hannah with Darren if Hannah could come home to her. Darren had been referred for domestic violence classes, but he had not begun the program. An LSSI caseworker told Bray that Darren had picked up the packet for family counseling services, but there was a $75 fee that he was not able to pay it. Darren told Bray that he would need financial assistance to pay for the packet. Bray told him that if he went to family services counseling and he could provide proof of

his income, a lot of times the family counseling services would change the fee based on a sliding scale. She told him that once he found out that fee, he could contact LSSI about it. To Bray's knowledge Darren had not undertaken any of her advice. Darren had been aware that he had to take these sessions since November 14, 2017. He was also recommended to engage in services since this case began in August 2016, but he has never done any of them.

¶ 14     Bray testified that during this case Ambra was arrested for domestic violence (the biting incident) and was currently on probation. As a condition of her probation she was ordered to engage in offender domestic violence counseling. To Bray's knowledge Ambra had not started that counseling, either. Ambra was still dating Darren and he had brought her to court that day.

¶ 15     Regarding visitation, Bray said that currently Ambra had supervised visitations with Hannah and there had been no progress toward moving toward unsupervised visitations. Bray was concerned about some of Ambra's behavior while visiting Hannah. For example, she needed a lot of prompting and help in knowing how to interact with Hannah. Bray said that due to the lack of progress in this case LSSI was going to take the case to legal screening in order to request that a goal change be made. LSSI was looking for permanency for Hannah and there had been no progress since the case opened.

¶ 16     On cross-examination Bray said that Ambra had expressed concerns about getting to services because Darren was the person who brought her to those services and that sometimes that caused an issue between them. Ambra had asked for gas cards in the past and she had been given them. Through the gas card hopefully she could ask someone other than Darren for a ride to services. Ambra had never requested bus passes. Regarding her medication, Bray said that Ambra was not currently properly medicated.

¶ 17    Bill H. testified that he was the CASA caseworker for Hannah, and he had been a caseworker for Hannah's brother, Jacob.  Ambra's rights to her son were terminated.  She was not dating Darren at that time.  Instead, DCFS had custody of Jacob because Ambra had alcohol in her system when she was pregnant with him.

¶ 18    Ambra testified that at some point during this case she was provided her medication through the Association for Individual Development (AID) in Aurora, but she was now responsible for picking up her medication herself.   She had been seeing her psychiatrist every three months and picking up her medication at Walgreens and taking it daily for the past month.  She attended weekly individual therapy through AID as well and had been regularly attending sessions from the beginning of this case and has been very consistent in attending therapy for the past year.  She was currently enrolled at Breaking Free and had attended all the group sessions.  Regarding individual sessions, Breaking Free expected her to pay a fee that she could not afford.  She was not currently working so she could not pay for those sessions.

¶ 19    Ambra said that she had been sober for the last two years.  Her caseworker told her that she had tested positive for alcohol, but that was because she was taking Nyquil for a cold.  Regarding Darren, Ambra acknowledged a recent involvement with the police where she got into an argument with Darren and the police were called and she was escorted out of Darren's car and she was told to keep away from Darren and she did.  However, they talked about the argument the next day and they both decided that they should not argue anymore because they had too much to lose.

¶ 20    Regarding her lack of compliance with her probation requirement to attend abuser domestic violence classes Ambra said that she now had her first appointment with her probation officer this week.  She had not been told that she was noncompliant or that the probation was being revoked.

¶ 21    At the conclusion of the hearing the court changed the goal to substitute care pending a determination of termination of parental rights.  The permanency order specifically stated:

> "The above goal was selected, and the other goals were rules [*sic*] out because:

> Based upon the lack of progress of Mom related to the issues that brought the case into court, including domestic violence, substance abuse and mental health.  Mom has dropped dirty, hasn't been consistent with treatment or medication management.  Mom continues to be involved with a paramour with domestic violence history who is also not involved in services."

¶ 22    On January 22, 2018, the State filed a petition for termination of parental rights.  The petition was amended two more times, with the final petition filed on September 6, 2018.  In that petition the State alleged that Ambra was unfit on several grounds:  (1) she failed to maintain a reasonable degree of interest, concern or responsibility as to Hannah's welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) she failed to protect Hannah from conditions within Hannah's environment that were injurious to her welfare (750 ILCS 50/1(D)(g) (West 2018)); (3) she suffered from habitual drunkenness  or drugs for at least one year prior to the commencement of the unfitness proceedings (750 ILCS 50/1(D)(k) (West 2018)); and (4) she failed to make reasonable efforts to correct the conditions that were the basis for the removal of Hannah from her, or to make reasonable progress toward Hannah's return during the nine month period from October 26, 2016 through July 26, 2017 and from July 27, 2017 through April 27, 2018 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 23                              A. Unfitness Hearing

¶ 24    The unfitness hearing began on January 17, 2019.  At the hearing Anne Reed, a LSSI supervisor, testified that the services that Ambra needed in order to try to reunify with Hannah

were: to obtain a substance abuse evaluation and follow any recommendations; participate in individual therapy to address her mental health issues; to cooperate with domestic violence services; to obtain stable housing; and to participate in visitations with Hannah. Ambra had been referred to Breaking Free for substance abuse treatment. As of October 2016, she had not participated in that program.

¶ 25    Officer Erin Jones testified that on March 3, 2016, she was dispatched to 904 North Avenue in Aurora to assist with an ambulance call. When she arrived at that address, she saw a woman who appeared to be incoherent and unresponsive. Ambra was identified as that woman. Her brother Marshall was also on the scene. Marshall told Officer Jones that Ambra said she took six pills of three different types of medicine. The paramedics arrived and Ambra was taken to the hospital.

¶ 26    Officer Caitlin Groom testified that on July 9, 2016, she was dispatched to Miller Avenue and Grand Boulevard in Aurora in response to a domestic violence call. When she arrived at that location, she saw a vehicle parked in the intersection and a male standing outside the vehicle. The male, who was later identified as Darren, approached Groom's squad car. He appeared very distraught and his shirt was torn. He also had an injury on his forearm that was consistent with a bite mark. Ambra was at the scene and being spoken to by another officer. Eventually Ambra was charged with domestic battery in connection with this incident.

¶ 27    Officer Ryan Tinsley testified that he was with Officer Groom on July 9, 2016, when he saw Ambra exit a silver Toyota and run across the street toward another officer's squad car. He initially began assisting Officer Groom in speaking to Darren, but then saw Ambra talking to Officer Fischer in a loud, excited state and flop down onto the asphalt directly onto her buttocks.

¶ 28    Officer Enrique Huerta testified that on or about April 28, 2017, at 7:50 p.m. he was discharged to 904 North Avenue in reference to a domestic violence disturbance. When he arrived at the scene he spoke to Darren, who was very distraught. He then spoke to Ambra, who told Officer Huerta that she and Darren got into a fight about cigarettes and she struck Darren in the face with a closed fist and pulled his shirt. Huerta thought that Darren needed medical attention, but he refused it.

¶ 29    Jennie Krull testified that she was a psychiatric nurse practitioner who evaluated Ambra in March 2016, shortly after Ambra had attempted suicide and been hospitalized. Krull confirmed that Ambra was properly diagnosed with Bipolar I and needed psychotropic medications. On November 18, 2016, Amber told Krull that a few days before, she had told Darren that she wanted to commit suicide and Darren then handed her a knife. When Ambra took the knife, Darren called the police. Ambra was again hospitalized.

¶ 30    On January 5, 2017, Ambra told Krull that Darren was using Hannah as a weapon and making her feel worthless. Krull discussed the option of taking Hannah to a shelter and leaving Darren but Ambra refused to do so. Their last appointment was on March 2, 2017. At that appointment Ambra said that she had another argument with Darren, and she had cut her wrists, which led to another psychiatric evaluation.

¶ 31    Jason Labedz testified that he was a counselor at AID. Labedz began working with Ambra in January 2017 for depression, anger management and trauma. Ambra had earlier been diagnosed with Bipolar I disorder. Ambra was Labedz' client throughout the year 2017. She missed 18 out of 40 scheduled appointments with him. He thought that Ambra showed progress in identifying her triggers that caused her behavior to escalate and maintaining her emotions during that time. However, there were times that he had concerns that Ambra could not maintain her emotions in

stressful situations. In 2018, Ambra missed 11 out of 27 scheduled appointments. Although Labedz recommended group therapy for her, she did not attend any sessions until the day before the unfitness hearing. Labedz would rate Ambra's overall progress as poor to moderate, primarily based on her poor attendance at individual and group counseling sessions.

¶ 32    On cross-examination, Labedz said that Ambra told him in the winter of 2018 that she had broken up with Darren. He explained that Ambra's diagnosis of bipolar personality type was a combination of manic episodes that produced increased energy, increased motivation, increased impulsivity, psychomotor agitation, moving around a lot more, putting individuals or herself at risk, and poor decision-making skills. Those episodes were followed by a depressive period where her motivation and energy decreased, her fatigue increased, she had more malaise and sadness. At times there was an increase in suicidality, ideation, and hopelessness.

¶ 33    Marialaina Bucci, a domestic and sexual assault counsel for Mutual Ground, testified that Ambra became her client in April 2018. Ambra had contacted Mutual Ground to receive counseling services as a victim of domestic violence. Ambra was scheduled for four sessions in May 2018 and she attended none. She was scheduled for two sessions in June 2018 and she only attended one session. Based upon her failure to regularly attend sessions Ambra was removed from counseling at Mutual Ground and put on a waiting list.

¶ 34    Laura Vargas testified that she was LSSI's foster care department program director. From October 3, 2016, until mid-February 2017, Ambra was granted supervised visitation with Hannah. However, from early November though December 31, 2016, visits were suspended after Ambra overdosed and was hospitalized. Then in January 2017 the foster parents informed Vargas that Ambra and Darren got into an argument during a supervised visitation. Following that incident Ambra again attempted suicide and was again hospitalized in a psychiatric ward. LSSI made a

critical decision at that time to again suspend visits and wait for Ambra to get out of the hospital, re-engage in services and then re-assess her mental health and stability. Visits were reinstated at the end of March 2017.

¶ 35    Lauren Szot testified that she was the LSSI caseworker assigned to Hannah's case. She was assigned to this case on March 9, 2017 and was still currently the assigned caseworker. An integrated assessment was done in late February 2017 that indicated Ambra should get a substance abuse evaluation and follow any recommendations from that evaluation. She missed the appointment that had been set up for her to receive a substance abuse evaluation in March 2017 at Breaking Free. Ambra was assessed in April 2017 and completed Breaking Free in June 2018. However, as of April 27, 2018, she had not completed substance abuse treatment. Szot said that Ambra missed seven scheduled urine drop between October 2016 to April 2018. In July 2017, her urine screen tested positive for Ecstasy.

¶ 36    Szot met with Ambra while she was incarcerated after committing a battery against Darren in April 2017. At that time Ambra knew that domestic violence was a key component in this case. Since Ambra was not making progress in any of her services, LSSI contacted DCFS in order to talk to a domestic violence expert. That expert found that Ambra needed domestic violence services for victims, not just perpetrators.

¶ 37    On August 17, 2017, respondent called Szot and she was sobbing and in a panic. Darren had told Ambra while they were driving in a car that he was going to pick up Hannah that day from day care. Ambra told him that he was not allowed to do that, and if he did, she would report it. Darren then slammed on the brakes in the vehicle they were riding in and Ambra hit her head on the dashboard. Ambra said that Darren then stopped the vehicle and called the police and alleged that Ambra had assaulted him.

¶ 38    On November 17, 2017, Ambra contacted Szot and told her that Darren had been abusive to her for the past few months and that it had recently happened again. Szot advised Ambra about shelter options. Four days later Ambra called Szot and told her that she and Darren had decided to stay together and wanted to explore couples counseling. Szot testified that Ambra was unemployed for most of the time that this case was pending. She did not have stable housing. Her visits with Hannah were never increased and never became unsupervised. Ambra had not completed any of the required services by the end of the second nine-month period in April 2018.

¶ 39    After hearing the parties' arguments, on April 4, 2019, the trial court held that Ambra had failed to make both reasonable efforts and reasonable progress during both times frames as alleged in the State's petition.

¶ 40                          B. Best Interests Hearing

¶ 41    On April 15, 2018, the trial court conducted a best interest hearing. At the hearing LSSI caseworker Szot testified that Hannah, who was three and a half years old, had been with her current foster placement for around a year and a half. Hannah's six-year-old half-brother Jacob was in the same placement and had been adopted by Hannah's foster mother, Lisa F (Lisa). Lisa wanted to provide permanency for Hannah and planned to adopt her if that was possible. Szot said that Hannah was bonded to Lisa and that they had a caring and loving relationship. Szot described the relationship between Jacob and Hannah and playful and close. Hannah had contact with Lisa's extended family and she was engaged in church and community activities with Lisa and Jacob. Hannah was in preschool in the mornings, where she received speech therapy, and she was in day care in the afternoons.

¶ 42    Lisa testified that Hannah had lived with her and Jacob since October 2017 and the transition to them all living together went very smoothly. The children were very bonded together.

Jacob always asks about Hannah when she is at school and he hugs Hannah good night. The children play together a lot. Lisa said that she loves Hannah very much and was willing to care for her now and in the future.

¶ 43     After the parties' arguments the trial court found that it was in Hannah's best interest to terminate Ambra's parental rights to her. The court noted that three-and-a-half-year-old Hannah had not been with Ambra for almost two-and-a-half years. Also, to the extent that Hannah had needs including food, shelter, and clothing, Ambra was not taking care of those needs. For the development of Hannah's identity, it was best if she was placed with her brother Jacob. To the extent that Hannah had familial, cultural and religious ties, those were with her foster mother Lisa. Also, where Hannah felt a sense of attachment, love and security favored termination. Finally, the court held that it was in Hannah's best interest if Ambra's parental rights were terminated. Ambra filed a timely notice of appeal.[3]

¶ 44                               II. ANALYSIS

¶ 45     On appeal, Ambra argues that the trial court's finding of parental unfitness and its finding that it was in Hannah's best interest to terminate her parental rights was against the manifest weight of the evidence. We will address each argument separately.

_____

[3] This appeal was accelerated under Supreme Court Rule 311(a) (eff. July 1, 2018), and therefore the appellate court must issue its decision within 150 days of the filing of the notice of appeal, except for good cause shown. Here, there was good cause to issue the decision after 150 days as the appellate court granted the appellant several motions for extensions of time to file the briefs.

¶ 46                                    A. Unfitness

¶ 47    The Juvenile Court Act provides for the termination of parental rights in a two-step process. First, there must be a showing upon clear and convincing evidence that the parent is unfit as defined in section 1(D) of the Adoption Act. *In re N.G.*, 2018 IL 121939, ¶ 28 (750 ILCS 50/1(D) (West 2018)). Proving any one ground for unfitness is enough to find a parent unfit. *In re M.I.*, 2016 IL 120232, ¶ 44. We will not reverse a finding of unfitness unless it is against the manifest weight of the evidence; that is, only when the opposite conclusion is clearly apparent. *Id*. ¶ 21.

¶ 48    A parent may be found unfit for his or her failure "(i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor *** or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(i)(ii) (West 2018).

¶ 49    Whether a parent has made reasonable efforts to correct the conditions that were the basis for the child's removal is judged by a subjective standard based upon the amount of effort that is reasonable for a particular person. *In re Jacorey*, 2012 IL App (1st) 113427, ¶ 21. Reasonable progress, on the other hand, is an objective standard, which exists when a parent's progress in complying with directives given for the return of the children is sufficiently demonstrable that the court, in the near future, will be able to order the child returned to parental custody. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88. It includes compliance with service plans and court directives considering the conditions that gave rise to the child's removal and other later-known conditions that would prevent the court from returning custody to the parent. *In re C.W.*, 199 Ill. 2d 198, 213-14 (2002).

¶ 50 Here, Ambra argues: (1) that considering the fact-specific circumstances that existed throughout the pendency of this case, Ambra had made reasonable efforts to correct the conditions which formed the basis for the removal of Hannah from her care and she had made reasonable progress toward Hannah's return to her care during the nine-month periods listed in the neglect petition (750 ILCS 50/1(D)(m)(i), (ii) (West 2018)); and (allegedly in the alternative) (2) Ambra was not given a sufficient opportunity to make reasonable efforts and progress without the involvement and interference of Darren and his mother Jennett.

¶ 51 Ambra contends that the "dynamics of the circumstances involved" are significant. Specifically, she argues that these proceedings made it clear that her instability and mental illness were a direct result of her being a repeated victim of mental, emotional and physical abuse from Darren. She claims that she was never given a full opportunity to make progress toward her goals absent the direct involvement of Darren or his mother, which was the acknowledged trigger for her mental health and stability issues. She notes that within two months of Hannah being moved out of Darren's mother's house the goal was changed from return home to substitute care pending a determination of termination of parental rights.

¶ 52 In response, the State argues that the evidence overwhelmingly supports the trial court's determination of unfitness. In addition to setting out the many instances of domestic violence on Ambra and Darren's parts, as well as Ambra's repeated failure to comply with court ordered services, the State points out that in March 2018 and again in July 2018 Ambra continued to take the position that Hannah should be returned to Jennett and should be allowed to have continued contact with both Jennett and Darren. Therefore, it contends, Ambra should then be estopped from changing her position on appeal, citing *In re Stephen K.*, 373 Ill. App. 3d 7, 25 (2007) (respondent-mother was estopped from challenging the trial court's finding at the dispositional hearing when

her counsel agreed with the State's recommendations at that hearing). The State also notes that the trial court specifically found Ambra's testimony that she had ended her relationship with Darren in December 2017 to be incredible, and it found that they remained together until at least mid-2018.

¶ 53 In reply, Ambra's counsel responds to the State's estoppel argument and states, "[i]n reviewing the report of proceedings and the motion filed by Ambra's trial counsel, however, there is evidence that Ambra's trial counsel may have had a conflict such that, at a minimum, the court should decline to apply the doctrine of judicial estoppel against Ambra in this appeal." Counsel then refers to a passage in the record where the court is asking Ambra's trial counsel if he represents Darren. When trial counsel tells the court that he does not represent Darren, the court then says that it will not then consider counsel's arguments on behalf of Darren or Jennett because they have no legal relationship to Hannah. During the same argument, Ambra's trial counsel argued:

"There is a mischaracterization of this toxic relationship. Mr. [M.] is supposedly the victim in this case. Hannah has done—I mean, Ambra has done everything she can that the court has ordered her, that DCFS has ordered her, to make sure than she can control the issues that brought us into this court to begin with. And yet in these reports that I have read, the few I have read, *they have characterized the victim as the abuser in this case. They have turned it around and said Mr. [M.] is the toxic person, that he's the one that instigates this.*

*And it's ludicrous to say that.* I have done dozens and dozens, probably hundreds of domestic battery cases, and *if I ever blamed the victim like DCFS and CASA is blaming him in this case, like he's the toxic person I mean*, the issue is this should [*sic*], nothing

- 18 -

should have been changed since September when you [*sic*] were in court. It should never have happened in October." (Emphasis added.)

¶ 54    When Ambra's counsel was finished arguing the trial court made the following statement:

"Okay. Thank you. *Frankly, based on your argument, it sounds like you're the attorney for Jennett,* and I know you're not because she doesn't have any standing in this case. She is not a party to this case over which I preside." (Emphasis added.)

¶ 55    Ambra's appellate counsel claims that the comments made by Ambra's trial counsel constitute a *per se* conflict of interest. Appellate counsel acknowledges that although Ambra did not raise this issue before the trial court, forfeiture is a limitation on the parties and not on the court and that we can relax the forfeiture rule to address a plain error affecting the fundamental fairness of a proceeding. Counsel then asks this court to "consider her substantive arguments as to the problematic placement of [Hannah] with Darren's mother."

¶ 56    We must note that Ambra's appellate counsel's reference to the record where her trial counsel seems to be arguing as an attorney for Darren, or even Jennett, is startling at first. However, a complete review of the record indicates that counsel picked that paragraph out of the record and took it out of context. The statements to which appellate counsel quotes are from a hearing on March 20, 2018, on Ambra's petition to continue services after the goal was changed to substitute care pending a determination of termination of parental rights. In her petition Ambra noted that after the goal was changed to substitute care all services to her were terminated, including visitation. Ambra also noted that LSSI had "terminated contact with individuals who have had significant contact with the minor including Darren [M.] (*Ambra's significant other*) and Darren's mother Jennett [M.]." (Emphasis added.) Ambra alleged that LSSI terminated Jennette's

foster parent agreement for no reason *"limiting the contact with Ambra, Darren and Jennett."* (Emphasis added.)

¶ 57    After reading the petition to maintain services it is obvious that Ambra wanted Jennett to be Hannah's foster parent throughout the termination proceedings so that she *and Darren, whom she alleged was her significant other*, could have visitation with Hannah.  Therefore, when trial counsel was arguing that Darren was the victim and not Ambra, he was doing so in order to put Darren in a better light so that Jennette could retain foster parent powers.  At that point, Jennette, Darren and Ambra all had the same goal:  to have Jennette re-appointed as foster parent so that Ambra and Darren could see Hannah more often.  Therefore, we find that no *per se* conflict existed between Ambra and Darren when trial counsel made his comments to which appellate counsel refers.  Accordingly, we need not address appellate counsel's arguments regarding forfeiture.

¶ 58    We agree with the State that Ambra is estopped from arguing that her progress was impeded because Hannah was placed with Jennett, whose son was a trigger for Ambra.  Her trial counsel's petition to continue services, as well as his arguments at the hearing on that petition, belie her claims on appeal that she did not have a sufficient opportunity to make reasonable efforts or progress because Jennett was Hannah's foster mother.

¶ 59    We now turn to Ambra's argument that she had made both reasonable efforts to correct the conditions which formed the basis for the removal of Hannah from her care and she had made reasonable progress toward Hannah's return to her care during the nine-month periods listed in the neglect petition (750 ILCS 50/1(D)(m)(i), (ii) (West 2018)).

¶ 60    There is overwhelming evidence here that Ambra did not make reasonable progress toward Hannah's return to her care during either nine-month period listed in the neglect petition (October 26, 2016 to July 26, 2017 and July 27, 2017 to April 27, 2018).  Again, we note that reasonable

progress is an objective standard, which exists when a parent's progress in complying with directives given for the return of the children is sufficiently demonstrable that the court, in the near future, will be able to order the child returned to parental custody. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88. At a dispositional hearing on November 22, 2016, Ambra admitted that she did not think Darren was Hannah's biological father. After a DNA test, Darren was excluded as the biological father on January 10, 2017. In that same month Ambra attempted to stab Darren with a knife and then turned the knife on herself. A psychiatric hospitalization followed and visitations with Hannah were suspended. In March 2017 DCFS and CASA had raised concerns in their reports about domestic violence between Ambra and Darren. At the dispositional hearing in March 2018 the court found that Ambra was unfit to care for Hannah. The court noted that Ambra had been assessed for services and needed continued mental health services, including psychotropic medication monitoring and individual therapy. She also needed to engage in domestic violence services and parenting classes, which had not yet begun.

¶ 61 In September 2017, near the middle of the second nine-month period, the trial court found that Ambra was making reasonable efforts but not reasonable and substantial progress. In that order the trial court indicated that Ambra fell asleep at a visitation with Hannah, so she was given a urine test, which tested positive for alcohol. At that time Ambra was still living with Darren, in violation of her bail bond requirement on her domestic battery case from July 2016 when she bit Darren during an argument with Hannah present. In November 2017 Ambra told her LSSI caseworker that Darren had been abusive to her. She cancelled the last two appointments in November 2017, did not give an excuse for cancelling them, and did not reschedule the visits. In December 2017, an LSSI supervisor told the court at a permanency hearing that out of three group and three individual meetings for substance abuse counseling in November 2017 Ambra had only

attended one meeting of each type of counseling session. Ambra had started substance abuse treatment back in April 2017 but by December 2017 she was still at level one.

¶ 62    For all these reasons, the trial court's decision to declare Ambra unfit for failing to make reasonable progress during either time period was not against the manifest weight of the evidence. Having upheld one basis for unfitness we need not discuss whether the trial court's decision to find Ambra unfit for failing to make reasonable efforts was against the manifest weight of the evidence. See *In re Brandon K.*, 2017 IL App (2d) 170075, ¶ 24 (any one ground of unfitness, is properly proven, is sufficient to enter a finding of unfitness).

¶ 63                              B. Best Interests

¶ 64    Ambra argues that the trial court erred in finding that it was in Hannah's best interest to terminate her parental rights. She argues that she could provide Hannah with good, clothing, shelter, stability, family and cultural ties if her rights were not terminated.

¶ 65    At the best-interest stage, a "parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The State must prove by a preponderance of the evidence that termination is in the child's best interests. *Id*. at 367. When considering whether termination of parental rights would be in a child's best interest, the trial court must consider several statutory factors within the context of the child's age and developmental needs. 705 ILCS 405/1-3(4.05) (West 2018).

¶ 66    This court will not reverse a trial court's finding that a termination of parental rights is in a child's best interests unless it is against the manifest weight of the evidence. *In re Anaya J.G.*, 403 Ill. App. 3d 875, 883 (2010). Again, a finding is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite conclusion. *In re M.I.*, 2016 IL 120232, ¶ 21.

¶ 67 Since a best interest determination is often a difficult one, our legislature has identified various factors that help inform that decision. Section 1-3(4.05) of the Act provides:

"Whenever a 'best interest' determination is required, the following factors shall be considered in the context of the child's age and developmental needs:

(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2018).

¶ 68    Regarding Ambra's claim that she could provide food, shelter, etc., to Hannah, even if that were true, the critical determination here was not what was in Ambra's best interest but, rather, what was in Hannah's best interest.  Based upon Ambra's unfitness, Hannah could not be returned to Ambra any time soon.  At the time of the best interest hearing Hannah had been with her foster mother Lisa for around a year-and-a-half.  Hannah's six-year-old half-brother also lived there and had been adopted by Lisa earlier.  Lisa wanted to provide a permanent home for Hannah and planned to adopt her if that was possible.  Szot described the relationship between Lisa and Hannah and bonded and loving.  Hannah was also bonded to her half-brother.   All these factors support the trial court's decision to terminate Ambra's parental rights to Hannah, and that decision was not against the manifest weight of the evidence.

¶ 69                                III. CONCLUSION

¶ 70    Accordingly, the judgment of the circuit court of Kane County is affirmed.

¶ 71    Affirmed.