NOTICE
Decision filed 08/13/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250210-U

NOS. 5-25-0210, 5-25-0211, 5-25-0212,

5-25-0213, 5-25-0214, 5-25-0215 cons.

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MELANY G.-B., MILES G.-B., MARLEY G.-B., MASON G.-B., MICAH G.-B., and MAXIMUS K., Minors | ) ) ) ) | Appeal from the Circuit Court of Marion County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) ) ) | Nos. 24-JA-40, 24-JA-41 24-JA-42, 24-JA-43, 24-JA-44, 24-JA-45 |
| Natasha G., | ) ) | Honorable Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*:  Where the trial court did not abuse its discretion in denying Natasha G.'s request for an order mandating an Illinois Supreme Court Rule 215(a) (eff. Jan. 1, 2018) mental health examination of her son, Marley G.-B., or in denying Natasha G.'s request to continue the adjudicatory hearing to obtain Marley G.-B.'s school records and medical records from his recent psychiatric hospitalization, we affirm the court's orders denying those requests and affirm the court's adjudicatory and dispositional orders.

¶ 2   Following up on a mandated reporter's call to the Department of Children and Family Services (DCFS) about physical abuse to a minor, Marley G.-B., DCFS sent a caseworker to his

1

school and then to his home. Based upon interviews conducted by the caseworker and interactions between the caseworker and Natasha G., Marley G.-B.'s mother, and Nathan K., mother's paramour, her six children were removed from the home. The State filed a petition for adjudication of wardship alleging that the children were in an environment that was injurious to their welfare and that Natasha G. did not protect her children from her paramour, Nathan K. Before the adjudicatory hearing, Natasha G. (Natasha) asked the court to authorize a mental health examination of Marley G.-B. (Marley), which request was denied. During the adjudicatory hearing, a DCFS caseworker testified that Marley had recently been diagnosed with a psychiatric condition. Natasha asked the court to adjourn the hearing to allow her to obtain Marley's psychiatric records, which request was denied. At the conclusion of the hearing, the trial court found that Natasha's children were neglected. Following entry of the dispositional order, Natasha appeals.

¶ 3                                                    I. BACKGROUND

¶ 4     On May 1, 2024, the State filed a petition for adjudication of wardship involving six children. The children are Melany, born September 11, 2006; Miles, born August 21, 2008; Marley, born June 27, 2009; Mason, born July 8, 2010; Micah, born May 7, 2013, and Maximus, born April 1, 2022. Natasha is the mother of all six. The father of Melany, Miles, Marley, Mason, and Micah is deceased. Natasha's paramour, Nathan K. (Nathan), is the father of Maximus. The State filed separate petitions for Natasha and Nathan. This case involves Natasha and her six children.

¶ 5     The six petitions for adjudication of wardship alleged that the children were neglected in that they were in an environment that was injurious to their welfare because Natasha's paramour, Nathan, "strangled, kicked and put his knee into the stomach of [Marley], leaving marks and a

bruise in violation of section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2022)). The State also alleged that Natasha failed to keep the six children safe, placing them at risk of harm.

¶ 6    At the hearing, Stacy Vance (Vance), a DCFS investigator, testified that she met with Marley at his school after he told his school counselor that Nathan physically harmed him. Marley informed Vance that he had gotten into trouble for pinching Micah and Nathan sent Marley and Micah to "time out" in the laundry room. Marley did not want to sit on steps in the laundry room and so he kept trying to stand up. When he attempted to stand up, Nathan placed his hands on Marley's shoulders to forcibly push him to a seated position. Then Nathan kicked Marley in one of his legs which caused him to fall to the floor. Although he had a bruise on one of his legs, Marley informed Vance that he did not know if Nathan's kick caused the bruise. While Marley was on the floor, Nathan kneed him in the stomach. Marley stated that when he again attempted to get up from the floor, Nathan became angry, yelled at him, and then strangled him. Marley told Vance that he had made a video and sent it to the school counselor. When Vance asked Marley why he created the video, he said that in a previous situation where Nathan had hit him, he had no video, and thus no evidence to establish what happened. As a result, DCFS "unfounded" that complaint. Vance viewed the video and testified that it was difficult to understand what Marley was saying because of a speech impediment and because he was so upset. However, Vance clearly heard Marley's claim that Nathan had strangled him. The video depicted red marks on Marley's neck, armpits, and his chest area. At the end of the school day, Vance's interview with Marley was not complete, so she drove to Marley's home to continue her investigation.

¶ 7    Vance stated that when she was at the home, both Natasha and Nathan were very upset. She described Nathan as agitated, erratic, and irrational. Vance testified that Nathan was yelling

obscenities, knocked trash cans around, left in his vehicle but returned no less upset, and refused to speak to Vance or her coworker.

¶ 8    Vance then continued her conversation with Marley. Marley told her that Nathan apologized and that while he thought Nathan was wrong, he recognized the quality of his home life. Vance testified that in the hour between the two conversations she had with Marley, he had spoken with Natasha and Nathan and began retracting his story.

¶ 9    Vance also spoke with Micah, who told her that he and Marley got into trouble for fighting and were sent to the laundry room for a time-out. Micah told Vance that Marley resisted going to the laundry room and Nathan forced Marley into a seated position on the steps. He told Vance that he was fearful that Nathan would hurt Marley. Micah said that while he was not afraid of Nathan, he was fearful for Marley because Marley always fights back.

¶ 10    Vance next spoke with Melany who stated that Natasha and Nathan frequently fought about Marley. Melany said that Nathan is often "stressed out" and is short-tempered and gets easily frustrated. She told Vance that when Nathan gets angry, he yells at the children, throws things, and knocks things from tables. While she did not believe that Nathan would intentionally hurt the children, she told Vance that she did not feel that they were safe when he was angry.

¶ 11    Vance also attempted to speak with Natasha who was agitated and yelling at Vance's coworker. Natasha made excuses for Nathan's behavior and stated that the children were safe in her home. Vance and her coworker tried to engage Natasha in a conversation about creating a safety plan for the children to prevent a recurrence of what had happened to Marley. Natasha refused to engage in this conversation. Vance testified that eventually Natasha and Nathan indicated that the interview was over.

¶ 12    Vance and her coworker decided that they needed to take all six children into protective custody due to Nathan's behavior, the intimidation of both Natasha and Nathan, and the history of unfounded DCFS investigations involving several of Natasha's children. Vance testified that Nathan had a prior indicated report in 2006 for sexual molestation of a child and a second sexual-based allegation.

¶ 13    On cross-examination by the guardian *ad litem* (GAL), Vance stated that Melany reported that after her mother began dating Nathan, she felt he was "creepy" and made her uncomfortable. Melany also reported that Nathan had done some "inappropriate" things to her.[1] Vance testified that Natasha had unfounded DCFS cases in 2023, 2020, and 2019. This investigation was the ninth one involving Nathan, three of which involved Natasha's children. Natasha told Vance that she was aware that DCFS had investigated Nathan, but all that had been unfounded. Conversely, Nathan said that Natasha knew about his indicated DCFS investigations. Natasha then backtracked and stated that she did not understand the meaning of the term, "indicated."

¶ 14    Natasha was employed and Nathan was unemployed and was the primary caretaker of the six children. Natasha informed Vance that while Marley was allowed to see the school counselor, he did not receive outside counseling because she did not believe in counseling. Her concern was that counselors only wanted to prescribe medications and that if children are in counseling, DCFS gets contacted. The "kids" told Vance that Natasha and Nathan told them not to speak with the school counselors. Natasha and Nathan both stated that DCFS's presence in their home was Marley's fault.

---

[1] In the family's first family service plan dated June 21, 2024, DCFS indicated that Melany reported that Nathan showed her how to access pornography at the age of 10 and had also informed her that he had become sexually aroused and then "showed her."

¶ 15    Natasha testified that she would do anything to get her children back. Specifically, she said that if the children needed to engage in counseling, she would take them. Nathan testified that he had been dealing with DCFS for over 20 years "and they've been harassing me and mentally abusing me." He concluded his testimony by stating that he would not hurt his children.

¶ 16    At the conclusion of the shelter care hearing, the trial court found that there was "overwhelming evidence of a long, long period of abuse and neglect." The court found probable cause to believe that the minors required "authoritative intervention" and that the situation was a matter of immediate and urgent necessity for the protection of the minors, warranting shelter care. 705 ILCS 405/3-12(2) (West 2022). The court stated that DCFS and law enforcement committed a grave disservice to the children, stating that "[t]he fact that this child had to make a video because—so that people would believe him when DCFS did not [previously believe him]." The court ordered DCFS to produce all founded and unfounded reports involving Natasha and/or Nathan to the state's attorney's office and to the GAL. The court ordered DCFS to get the children into trauma informed counseling, noting that by changing his story, Marley was taking the blame for what had happened to him in his encounter with Nathan. The court also directed DCFS to have the children evaluated to determine if any medication is required. The court ordered Natasha and Nathan to have no contact with the children.

¶ 17    On May 29, 2024, the court held the next hearing. Natasha had hired counsel. The trial court appointed counsel for Nathan. Nathan asked the trial court to allow him to have visitation with Maximus. Samantha Bustos (Bustos), the caseworker with Hoyleton Youth and Family Services,[2] informed the court that the children were now in separate placements and that she

_____

[2]DCFS engaged the services of Hoyleton Youth and Family Services in these cases. Throughout this order, Hoyleton Youth and Family Services will be referred to as DCFS.

6

intended to set up sibling visits as well as visits with the parents. The GAL reminded the court that the judge entered a no-contact order at the shelter care hearing barring the parents from visits with the children.

¶ 18 On June 21, 2024, DCFS filed a family service plan. DCFS reported multiple risk factors that existed when the case was opened: sexual abuse as outlined by Melany; physical abuse to Marley; emotional abuse to Marley because he was targeted as the source of the family's problems; excessive discipline because the duration of any periods of being "grounded" was several months; Nathan's "force, control, and/or intimidation" approach to parenting; and Natasha's and Nathan's failure to understand the impact of their behaviors on the mental and emotional wellbeing of the children. DCFS set a permanency goal of return home within 12 months. DCFS determined that Natasha needed the following assessments and services: a non-offender psychosexual assessment and any recommended services, a domestic violence assessment, random drug tests, and a mental health assessment and any recommended services.

¶ 19 DCFS filed an integrated assessment, noting that DCFS interviewed Natasha on June 7, 2024, who was generally compliant during the interview, but somewhat evasive on questions about the reasons for DCFS involvement. Natasha was previously investigated by DCFS, but none of the investigations were indicated. Natasha stated that she did not know why DCFS was currently involved as her "children were not in danger." Natasha stated that she had recently ended her relationship with Nathan because of this case. She stated that Nathan yelled at her children but was never physically aggressive with them. She denied any domestic abuse. Natasha was employed at North American Lighting and had lived in Salem for the past 10 years. DCFS noted that Natasha struggled with her ability to self-regulate, allowing her anger to build up and "boil over." Natasha denied knowledge of Nathan's previous sexually inappropriate allegations, but DCFS noted that

7

from an earlier DCFS case, Natasha had been informed of these allegations. DCFS stated that Natasha was "emotionally neglectful" in that she would not regularly interact with her children. More specifically, if one of her children was "in trouble," Natasha would not talk to the child for months. Melany alleged that Natasha physically beat her. Melany identifies as gender fluid, which Natasha refused to accept, and refused to call Melany by the name she had chosen, Sam. Natasha also frequently blamed Marley for family issues. DCFS noted that the youngest child, Maximus, had developmental delays and was receiving services. DCFS reported that Maximus also had social and emotional concerns that it attributed to Natasha's long work hours and the number of children in the household that "impacted her ability to fully interact with and provide the stimulation necessary to assist a young child in meeting important milestones. DCFS stated that Natasha needed to gain insight into what resulted in the current DCFS case and removal of the children from her care. DCFS recommended that Natasha participate in parenting education, individual mental health therapy, family therapy, receive education and resources for families of gender-diverse children, and develop a safe childcare plan when she works or needs time for herself. DCFS recommended that Natasha be allowed to engage in supervised visitation with her children.

¶ 20    DCFS filed its next report on June 24, 2024, outlining the required service plan steps that needed to be completed. All of the children, except Maximus, were referred for mental health or trauma-informed therapy. Maximus would receive physical, occupational, and developmental therapies. DCFS had concerns with the maternal grandparents who were fostering Miles, Micah, and Mason because the grandmother stated that she did not believe Nathan harmed Marley. The grandmother also stated that she blamed Marley for DCFS's current involvement with the family. The grandfather told DCFS that he did not want Miles, Micah, and Mason to have sibling visits

8

with Marley. DCFS stated that "the substitute caregivers' perception of the abuse to the children may be incredulous, which may inhibit their ability to safely care for the children or be supportive of efforts to keep the children safe from their parents."

¶ 21 On June 24, 2024, the trial court held the next hearing it labeled as a "pretrial." The purpose of the hearing was to select a date for the adjudicatory hearing. The court noted that the statute mandated a 90-day timeline. The parties indicated that they had no objection to holding the adjudicatory hearing past the statutory 90-day rule. Natasha's attorney asserted that Natasha was not the cause of any harm to the children and asked the court to allow her to engage in supervised visitation with her children. The GAL indicated that she needed additional information from DCFS and was not prepared to argue the issue that date. The judge suggested that the court should inform Marley and the other children that what happened was not Marley's fault. The judge set the conversation with the children for July 22, 2024, and informed the attorneys that they needed to be present for the court's conversation with the children. The court also indicated that it would hold another pretrial hearing on this same date. The court set the adjudicatory hearing for August 26, 2024.

¶ 22 On July 18, 2024, DCFS filed a "Pre-Adjudication Status Report." DCFS reported that after Nathan attacked Marley on April 26, 2024, he fled the house and went to a friend's house where he filmed the video showing the marks on his neck, chest, and underarms. Upon his return home, Nathan kicked him and hit him on the head with a shoe. Marley reported that Natasha was present and witnessed this second attack. The children informed DCFS that they had been instructed by Natasha and Nathan to never speak to school counselors. Marley stated that he was concerned about the fallout from his video and report of the incident to his school counselor

9

because the last time he reported this type of incident, his subsequent punishment lasted several months.

¶ 23 On August 23, 2024, Natasha filed a motion for a psychiatric evaluation of Marley, noting that Marley had a "long history of opposition and defiance to authority." The motion states that teachers have informed Natasha that Marley threatened to accuse her of wrongdoing by means of self-made video. Natasha asked the trial court to order the psychiatric evaluation prior to the adjudicatory hearing.

¶ 24 On September 16, 2024, the trial court held a hearing on a motion to continue the adjudicatory hearing because of Natasha's motion seeking a psychiatric evaluation of Marley. The trial court asked Natasha's attorney what authority the court had to order a child to undergo a psychiatric examination and how such an exam would be relevant or even admissible in evidence. Natasha's attorney responded that this was a "common sense" motion because Marley had been diagnosed with oppositional defiant disorder since the first grade, stating: "There have been occasions when he has even threatened school officials if they don't do his bidding, he would get them in trouble using a video." The attorney suggested that if the court ordered the psychiatric examination, "we might get to the bottom of it." The court then asked if the psychiatric evaluator would render an opinion that Marley was being truthful or not, and Natasha's attorney stated that would be improper. The trial court agreed and then asked how the evaluation would be admissible. Natasha's attorney argued that the evaluation would be "highly relevant" because an oppositional defiant disorder diagnosis necessarily meant that Marley lies: "They will do anything and everything. If you oppose them, then they will do anything to destroy you. There is nothing they won't do if they have that particular disorder."

¶ 25    In response, the State asked the court to proceed with the adjudicatory hearing, stating that there was no need for delay and for an independent evaluation. The trial court agreed and denied the motion for a mental examination, stating: "It is absolutely contrary to any rule of evidence that exists with regard to cross-examination and a court's determination of a witness' veracity." The adjudicatory hearing was set for November 25, 2024.

¶ 26    On September 17, 2024, DCFS filed its next report, noting that Natasha completed her mental health assessment and was referred for services. As of July 29, 2024, Natasha regularly attended her mental health appointments. She was scheduled to begin a two-month parenting course on August 15, 2024. Natasha completed a domestic violence assessment which determined that she did not need services.

¶ 27    On November 25, 2024, the trial court began the adjudicatory hearing. The State called three witnesses: Stephanie Clark, Sarah Purcell, and Stacy Vance.

¶ 28    Stephanie Clark (Clark) testified that she was the school counselor that Marley spoke to after the incident. Marley spoke with Clark at the beginning of the school day on April 29, 2024. She described his demeanor as "sad" and said that he had tears in his eyes. Marley then emailed her the video he created to document his injuries. He informed Clark that he and his brother, Micah, were being punished, and Nathan held Marley down on the stairs which hurt him. Marley described being strangled and kicked in a leg. Clark also interviewed Micah who indicated that Marley and Nathan had gotten into a fight. Marley told Clark that he did not want his siblings "taken away," but that he could no longer live there. Clark stated that Marley spoke with her about similar issues in 2023—that Nathan had hurt him. Marley informed Clark that he made the video this time to have proof. Clark testified that both Marley and Micah previously informed her that their parents told them not to speak with her. On cross-examination, Clark stated that Marley spoke with her at

11

least once per month over the past three years. She testified that she did not know what issues led the school to conclude that Marley needed an IEP.

¶ 29    Sarah Purcell (Purcell) testified that she was one of the Salem police officers at Natasha's and Nathan's home to assist DCFS with its investigation of Marley's claims. Purcell said that Natasha and Nathan were upset and uncooperative with DCFS, calling the workers names and repeatedly questioning why DCFS was there. Nathan left and returned to the house twice during the investigation as he became extremely agitated. Natasha told Purcell that she and Nathan never physically punished the children. Instead, she stated that they took away games. When DCFS decided that they were taking all six children into protective custody, Natasha became extremely upset and tried to keep the police and DCFS from entering the home to get the children.

¶ 30    Vance testified that she became involved in this case when DCFS received a hotline call about Marley having been physically abused. Vance went to Marley's school, and she spoke with Marley and Mason. Marley told Vance that he and Micah had been pinching each other on the date of the incident, which angered Nathan. Nathan ordered both boys to the laundry room as punishment. Marley did not want to sit on the stairs in the laundry room and Nathan pushed him down onto the stairs. When Marley stood up, Nathan kicked Marley in the leg. Marley told Vance that he then doubled over, and Nathan used his knee to strike Marley in the stomach. Then Nathan put his hands around Nathan's neck and choked him until Marley could not breathe. At school, Marley showed her the bruise on his leg, but informed Vance that he was not certain that was where he had been kicked by Nathan. She viewed Marley's video and testified that it demonstrated that Marley had red marks around his neck and shoulders. Vance characterized his demeanor as depicted on the video as "hysterical," and stated that he was crying uncontrollably. He also informed Vance that Nathan hit Micah. Vance stated that Marley wanted "something done," in

12

that he was tired of being battered at home. Marley advised that whether he felt safe in his home depended upon whether Nathan was angry. Vance testified that she also spoke with Mason, who denied any physical abuse in the home. He said that he was in the other room when Marley and Micah got into trouble.

¶ 31 Vance next went to the police department to secure assistance and then went to the home. Both Natasha and Nathan were home when Vance arrived and were resistant to allow DCFS to speak with the children, but eventually Natasha acquiesced. When Vance attempted to resume her conversation with Marley, Marley said that he had made a mistake, and that he had spoken with Natasha and Nathan and "[t]his wasn't going to happen again." Marley told Vance that he knew Nathan never intended to hurt him.

¶ 32 Vance also spoke with some of the other children. Micah informed Vance that he saw Nathan try to force Marley to sit on the laundry room steps. Micah said that he was frightened by these events because he did not want to see Marley get hurt. Melany advised that Nathan had hit all of the children before, but mostly Marley. Melany stated that Nathan is short-tempered, frequently stressed, and gets easily frustrated. However, if Nathan was not angry or upset, she felt safe in the home. Melany also informed Vance about sexual statements Nathan made to her. Miles told Vance that he was in school at the time of the incident, and that there was no physical abuse in the home. Vance testified that they checked Maximus's body for any injuries and found none.

¶ 33 Vance stated that she was concerned about the level of protection Natasha was providing the children, as she disputed what Marley and Melany said by claiming that they misinterpreted or were taking things out of context. Vance said that she attempted but was unable to speak with Nathan that night. At the end of the first day of the adjudicatory hearing, the trial court granted Natasha's motion to end the no-contact order and ordered visitation at DCFS's discretion.

13

¶ 34 The adjudicatory hearing resumed on December 16, 2024. At the beginning, Nathan's attorney asked the court to direct a verdict in his favor stating that there was no corroboration of Marley's allegations. Natasha's attorney then adopted the motion for a directed verdict. The GAL contended that Marley's allegations were, in part, corroborated by the statements of Melany and Micah. In addition, Marley had a bruise on his leg, and injuries to his neck and shoulders were visible on the video. Natasha's attorney pointed out that Micah's statements to DCFS only stated that Nathan picked Marley up by the back of his neck and forced him into a seated position.

¶ 35 The trial court responded that the statement of a child regarding an allegation of abuse is admissible, but if otherwise uncorroborated, the child's statement cannot form the sole basis for a finding of abuse or neglect. The court noted, however, that in listening to the testimony, Micah said that Marley and Nathan got into a fight, and that Micah saw Nathan push Marley down onto the steps. Micah also said that he did not want to see Marley get hurt. The video revealed the red marks around Marley's neck and the bruise on the leg was seen by the school counselor. The court also took note of how upset Marley was in the video. When Marley was questioned, he said that he wanted to cancel his report because it would make it worse. Marley also stated that Nathan did not intend to hurt him, and that Natasha and Nathan said that the situation would not happen again. Moreover, Micah and Marley were told by Natasha not to talk to the school counselor. Melany informed DCFS that she had witnessed Nathan hit all the children and stated that he hit Marley the most. Melany said that Nathan was short-tempered, and she only felt safe if Nathan was not upset. Thus, the court found that Marley's statements were corroborated and denied the motions for directed verdict.

¶ 36 Nathan testified at the adjudicatory hearing that he had lived with Natasha and her children for over six years. On April 26, 2024, he was home, and the children went to school for a half-day

and were home before noon. Marley and Micah were in the living room, and he told them to be quiet because Maximus was sleeping. Then, the boys began fighting. He told them to come into the laundry room for a time-out. Nathan said that Marley threw "a fit" and would not sit on the stairs. Nathan told Marley to calm down. Marley told Nathan that he did not have to listen to him, and that Marley tried to tackle him. Nathan testified that he put a wrist on Marley's left shoulder and pushed him away to break Marley's grip. After Marley cussed at Nathan, Nathan told Marley to get out of the laundry room. A few minutes later, Micah informed Nathan that Marley had "run away." A police officer brought Marley home informing Nathan that Marley was at a friend's birthday party. Nathan said that Marley had behavioral issues including lying, stealing, and breaking things. Nathan denied that he ever struck Marley, placed his hands around his neck, or kneed him in his stomach.

¶ 37    On cross-examination, Nathan denied that he had a temper. He testified that he contacted Natasha to inform her that Marley had run away, and she came home from work early. He stated that Natasha called the police to report Marley's absence. The GAL asked Nathan why the children were afraid of him, and he responded: "Because I'm their dad and I discipline them." Nathan denied telling the children not to speak to school counselors.

¶ 38    Natasha's attorney called DCFS caseworker Bustos to testify. She is employed as a foster care case manager by Hoyleton Youth and Family Services. She testified that after an incident with Marley at school, he underwent a screening to determine appropriate steps for mental health services. Marley was currently inpatient at Lincoln Prairie Behavioral Health Center in Springfield. On or about November 18, 2024, Marley got into a verbal altercation with another student at school and told the student to "shut up" or he was going to "shoot up the school." Marley contended that he had been talking about a video game called Modern Warfare and that this other

15

student misunderstood him. The school suspended him until December 2, 2024. While Marley was eligible to be released from the psychiatric hospital on December 4, 2024, DCFS scheduled a "clinical staffing" to find Marley a more specialized foster placement to better manage his diagnosis of disruptive mood dysregulation disorder. Bustos testified that Marley had previously been diagnosed with attention-deficit/hyperactivity disorder (ADHD), for which he required medication. DCFS also recommended mental health therapy for Marley based upon his integrated assessment.

¶ 39    Natasha testified that she had been in a relationship with Nathan since 2018, and he had watched the children since the middle of 2018. Marley displayed emotional issues that began in the first grade, and he had an IEP at school from first through the eighth grades. Beginning in the fourth grade, Marley's IEP was focused upon his "emotional disability." Natasha testified about the previous unfounded DCFS contact in 2023. At that time, Marley claimed that Nathan hit, kicked, and punched him, and threw him into a wall or coffee table. Natasha did not remove Nathan from the home after this incident because "[t]here were no marks on Marley and he had a history of lying."

¶ 40    During Natasha's testimony, her attorney asked the trial court to continue the adjudicatory hearing until he received the psychiatric records or a psychiatric report regarding Marley's new diagnosis of disruptive mood dysregulation disorder. The trial court denied the request. Natasha said that there have been times when Marley's mood would radically swing. The mood swings occurred when he was angry and/or when he did not "get his way." The mood swings began when Marley was in the first grade. During a mood swing, Natasha stated that Marley behaves in an erratic and emotional manner during which he screams, stomps, throws and breaks things. Natasha said that he becomes unintelligible when he gets extremely agitated. She said that these "attacks"

16

occurred about twice per month. She testified about videos she took of Marley during one of his previous mood swings in April 2023, approximately one month after the prior DCFS case had been determined to be unfounded. She stated that he had been disciplined by taking away his PlayStation after he and Mason had an argument. On April 26, 2024, Nathan called her at work to tell her that Marley had run away. She contacted the police who reached out to Marley's school principal to ascertain who his friends were. Natasha then left to take Miles to the eye doctor in town. While she was with Miles, Nathan notified her that the police had located Marley and brought him home. Natasha said that she saw no marks on Marley's body that day. She also testified about receiving an email from Marley's school counselor on September 14, 2023, who alerted her to statements Marley made in school that he wanted to kill himself.

¶ 41 On cross-examination by the State, Natasha stated that she had only begun videotaping Marley in 2023 when his behavior worsened. When asked if she tried to get help for Marley, Natasha pointed to the school professionals and said that she "was trying." She testified that oftentimes when he had these mood swings, he would grab the back of his neck and hit himself in the head. She said that she began videoing him because he was becoming more violent and she was fearful for her baby, Maximus. She testified that she did not reschedule Miles' eye appointment on the day Marley was missing because it would have taken six months to get another appointment, and she knew that the police would find Marley. Natasha said that he ran away on March 3, 2023, and the police found him. Natasha testified that she was looking into ways to get Marley help, but she "worried about medication and messing up his brain."

¶ 42 On cross-examination by the GAL, Natasha clarified that during summer break, Marley did not have access to counselors or social workers, stating that he could talk to her or to her parents. She confirmed that she never sought counseling for Marley and never spoke to his

17

pediatrician about his "behaviors." Although she testified that Marley's behavior became worse in 2023, she stated that she sought no additional resources, stating: "I thought the school was sufficient." Natasha denied that Melany told her about Nathan's sexualized behavior. She testified that before this DCFS case was opened, she and Nathan contemplated whether he should move out because of Marley's behavior. She confirmed that Nathan struggled with parenting Marley but stated that "everyone" struggled with Marley. Natasha testified that she was the sole financial support for the family and that she did not have money to hire a psychiatrist or a psychologist for Marley.

¶ 43    On recross examination by the State, Natasha was asked to confirm that she could not afford a psychiatrist or a psychologist. She responded that the school had not recommended further counseling: "that's why I thought it was fine." She also stated that she lacked funds for mental health care for Marley but confirmed that Marley was on Medicaid. She testified that she had tried to call some providers, but that they would not take the medical card. However, she then testified that she did not know how to get a psychiatrist or psychologist. She admitted that because the children were on Medicaid, there would be no cost for a psychiatric appointment.

¶ 44    In ruling that the State had met its burden of proof by a preponderance of the evidence that the minors were neglected because (1) they were in an environment injurious to their welfare because Nathan physically harmed Marley and (2) Natasha failed to keep her children safe and placed the children at risk of harm, the court acknowledged that Marley's behavior was "frustrating and difficult to deal with," but stated that Natasha and Nathan were "ill equipped in addressing [Marley's behavior] with something other than violence." The court noted the inconsistencies in Natasha's statements that she tried to get help for Marley, noting that while she videotaped Marley's behavior, she never showed the videotape to a doctor, the school counselor, or the school

social worker. The court stated: "Other than embarrassing this child for behavior that possibly he could not control, I don't see the reason for videotaping it except as evidence which is what it was used for today in this hearing." The court also commented on Natasha's behavior as witnessed by Vance which included yelling, refusing to allow DCFS to see Maximus, and calling DCFS workers and police officers names. The court noted that both Melany and Marley stated that Natasha was aware of Nathan's abuse and did nothing. The trial court filed its adjudicatory order on December 18, 2024, and set the dispositional hearing for January 15, 2025.

¶ 45    On January 10, 2025, Natasha filed a posttrial motion. In count I she asked the court to reconsider its adjudicatory order arguing in part that Marley's September 23, 2023, claim to his school counselor that he may attempt suicide and film it established Marley's knowledge of the manipulative effect of a staged video. Thus, Natasha argued that Marley staged the "injuries" in the video taken the day of Nathan's attack to back up his claim that Nathan attacked him. She also argued that because Marley is not psychologically well, his perception of reality could be tainted, and the court should not have relied on Marley's statements. In count II of her posttrial motion, Natasha asked the court to reopen proofs and vacate its findings stating that while the State informed Natasha that Marley was in a psychiatric hospital, the State failed to inform counsel. She argued that she was prejudiced by the State's failure to timely disclose Marley's hospitalization and diagnosis. Natasha asked the court to vacate its adjudicatory findings and order the State to disclose Marley's psychiatric records.

¶ 46    DCFS filed a dispositional hearing report on January 10, 2025, noting that Natasha remained employed and lived in the same house. Natasha's mental health services were ongoing, and her provider stated that she was unable to see any significant changes in her behavior and was concerned that Natasha did not understand her role in the children being removed by DCFS. DCFS

19

made a referral to its psychology unit to have Natasha further evaluated. Nathan moved out of Natasha's house the day of the incident, because DCFS mandated that he do so. Natasha's visits were scheduled to start in early January 2025.

¶ 47    Overall, DCFS found that progress on the recommended service goals was not substantial and stated its concern about returning the children to Natasha and Nathan because both parents failed to understand why DCFS became involved. DCFS recommended that the permanency goal remain return home within 12 months. On February 12, 2025, DCFS filed a report to update the court prior to the dispositional hearing. DCFS met with its sexual abuse services coordinator on January 22, 2025, to discuss recommendations for Natasha following her non-offending parent assessment. Natasha scheduled her own sexual abuse assessment. The person who conducted Natasha's initial assessment later admitted that she had not been informed of the two sexual incidents involving Melany and Nathan. DCFS then determined that this assessment was flawed because the assessor did not have all relevant information. DCFS decided that Natasha needed to have a second assessment with a provider chosen by DCFS. Natasha started supervised visits on January 6, 2025, which were going well.

¶ 48    The court held a dispositional hearing on February 12, 2025. Before the hearing began, the court denied the post-adjudication motions to reopen proofs and vacate findings.

¶ 49    Natasha testified at the hearing that she had completed all service plan tasks and that all services were beneficial. She testified that caseworker Bustos had not provided her with locations to have the psychosexual evaluation completed, so she found her own provider, and completed the evaluation. Natasha said that her visits with the children just began, and they were going well. She believed that it would be beneficial to Marley to allow him back into her care. She testified that

20

caseworker Bustos told her it would be okay to allow Nathan to move back into her home, but she opted not to do so.

¶ 50    The court took issue with Natasha and Nathan seeking their own psychosexual evaluations without the evaluator having any background to know why the parents were presenting themselves for an evaluation. The court also stated that the parent's contention that Marley created the situation—that he faked injuries to get Natasha and Nathan reported to DCFS—was unfair to Marley because Natasha never sought a diagnosis and/or treatment for him. The court noted that the purpose of service plan objectives was to effectuate behavioral change and then stated that there had been zero change in the behaviors of Natasha and Nathan since the case was opened.

¶ 51    On February 19, 2025, the trial court entered a dispositional order finding that Natasha and Nathan were unfit parents for reasons other than financial circumstances alone, maintained the permanency goal of return home within 12 months, made the children wards of the court, and placed custody and guardianship of the children with DCFS.

¶ 52    Natasha timely appealed the adjudicatory and dispositional orders.

¶ 53                                    II. ANALYSIS

¶ 54    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) provides a step-by-step process to be used in determining whether a child should be removed from his or her parents and made a ward of the court. *In re Arthur H*., 212 Ill. 2d 441, 462 (2004). The first step of the process begins with the State filing a petition for wardship. *Id.* A temporary custody hearing is conducted and the court must "determine whether there is probable cause to believe that the child is neglected, whether there is an immediate and urgent necessity to remove the child from the home[,] and whether reasonable efforts have been made to prevent the removal of the child or that no efforts reasonably can be made to prevent or eliminate the necessity of removal." *Id.* If the

21

trial court finds probable cause, the child is placed in temporary custody and the process continues. *Id.*

¶ 55 The second step of the process, the adjudicatory hearing, requires the court to determine whether the child was the subject of abuse, neglect, or dependence. *Id.* If the State fails to prove the allegations of abuse, neglect, or dependence by a preponderance of the evidence, the petition must be dismissed. *Id.* at 464. If the court finds that the State has proven abuse, neglect and/or dependence, the case proceeds to the third step, which is a dispositional hearing. 705 ILCS 405/2-21(2) (West 2022).

¶ 56 "At the dispositional hearing, the court shall determine whether it is in the best interests of the minor and the public that he be made a ward of the court, and, if he is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public." *Id.* § 2-22(1). The court must also consider "the permanency goal set for the minor, the nature of the service plan for the minor and the services delivered and to be delivered under the plan." *Id.*

¶ 57 "The purpose of a dispositional hearing is not to terminate parental rights." *In re April C.*, 326 Ill. App. 3d 225, 237 (2001). Rather, "a dispositional hearing serves the purpose of allowing the circuit court to decide what further actions are in the best interests of a minor, and the hearing and ruling on whether to make a minor a ward of the court gives the parents 'fair notice of what they must do to retain their rights to their child' in the face of any future termination proceedings." *Id.*

¶ 58 "Cases involving abuse, neglect and wardship are *sui generis*; each case must be decided on its own distinct set of facts and circumstances." *In re M.W.*, 386 Ill. App. 3d 186, 197 (2008). "Though the court, when making the wardship determination, considers the specific parent's

22

capability to care for the child, *** the wardship determination is based on the best interest to the child when considering the totality of the circumstances surrounding the child's life." *In re D.S.*, 2018 IL App (3d) 170319, ¶ 15. A dispositional order is generally considered final and appealable. *In re Brandon S.*, 331 Ill. App. 3d 757, 760 (2002) (citing *In re D.S.*, 307 Ill. App. 3d 362, 365 (1999)).

¶ 59    The trial court's findings regarding wardship and fitness at the dispositional hearing stage are given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006); *In re T.B.*, 215 Ill. App. 3d 1059, 1061 (1991). Because a trial court is in a superior position to assess the credibility of witnesses and weigh the evidence, an appellate court will not overturn the trial court's findings merely because the appellate court may have reached a different decision. *In re Lakita B.*, 297 Ill. App. 3d 985, 994 (1998). A trial court's determination of wardship or fitness will be reversed "only if the factual findings are against the manifest weight of the evidence." *In re Kamesha J.*, 364 Ill. App. 3d 785, 795 (2006). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 60    Natasha raises two issues on appeal. She first claims that the trial court erred in denying her request that Marley undergo a mental health examination. Secondly, she contends that the trial court should have adjourned the adjudicatory hearing to allow her to authenticate his school IEP records and to obtain Marley's psychiatric records related to his recent hospitalization.

¶ 61                    A. Mental Health Examination

¶ 62    Illinois Supreme Court Rule 215(a) provides:

"In any action in which the *** mental condition of a party or of a person in the party's custody or legal control is in controversy, the court, upon notice and on motion made within

23

a reasonable time before the trial, may order such party to submit to a *** mental examination by a licensed professional in a discipline related to the *** mental condition which is involved." Ill. S. Ct. R. 215(a) (eff. Jan. 1, 2018).

" 'Rule 215 is a rule of discovery, the purpose of which is to permit the discovery of facts which will assist the trier of fact to reach a correct determination of the issues before it.' " *Kallal v. Lyons*, 2021 IL App (4th) 200319, ¶ 18 (quoting *In re Conservationship of the Estate of Stevenson*, 44 Ill. 2d 526, 529 (1970)). Although Rule 215 allows a trial court to order a mental health examination, the rule " 'does not permit unlimited and indiscriminate mental *** examinations of persons.' " *Id.* (quoting *In re Conservationship of the Estate of Stevenson*, 44 Ill. 2d at 529). A trial court may use its discretion to order a mental examination, but only if certain requirements are met. *Id.* The Illinois Supreme Court explained:

"The person sought to be examined must be a party (or a person in his custody or legal control), the physical or mental condition of that person must be in controversy *** for the examination. Then, and only then, is discovery of that person's *** mental condition authorized by this rule." *In re Conservationship of the Estate of Stevenson*, 44 Ill. 2d at 529.

The Illinois Supreme Court cautioned that the "in controversy" limitation "is particularly evident *** where the person sought to be examined has not raised the issue of his physical or mental condition." *Id.* However, the court also noted that Rule 215 contemplates that the trial court maintains the discretion to order the mental examination "under appropriate conditions when all requirements of the rule have been met, irrespective of who has raised the issue of the person's *** mental condition." *Id.* at 530. Moreover, the provisions of Rule 215(a) are not compulsory. *Happel v. Mecklenburger*, 101 Ill. App. 3d 107, 113 (1981). A trial court has broad discretion in

24

determining whether to order a mental examination, and the trial court's decision will not be reversed unless the court abused its discretion. *Doe v. Weinzweig*, 2015 IL App (1st) 133424-B, ¶ 20. "[A]n abuse of discretion will be found only where the trial court's decision is 'arbitrary, fanciful or unreasonable' or 'where no reasonable man would take the view adopted by the trial court.' " *People v. Illgen*, 145 Ill. 2d 353, 364 (1991) (quoting *People v. M.D.*, 101 Ill. 2d 73, 90 (1984)).

¶ 63     Here, Natasha argues that the trial court should have granted her request that Marley undergo a mental health evaluation because of doubts about Marley's truthfulness. She contends that Marley's statements and his non-contemporaneous videotaped recording were not corroborated by the testimony of two of Marley's siblings who were present during Nathan's alleged physical assault. She asserts that Marley's perception "makes all the difference in this case" as "[t]he difference in an assault and routine discipline lies in the perception of the child." Because Marley may suffer from a mental condition that could potentially affect his perception of events, her request for a Rule 215 mental examination should have been granted.

¶ 64     At the pretrial hearing, Natasha's attorney informed the court that Marley had been diagnosed with oppositional defiant disorder[3] since he was in the first grade. Natasha's attorney

---

[3]Oppositional defiant disorder has the following diagnostic criteria:

"A. A pattern of angry/irritable mood, argumentative/defiant behavior, or vindictiveness lasting at least 6 months as evidenced by at least four symptoms from any of the following categories, and exhibited during interaction with at least one individual who is not a sibling.
**Angry/Irritable Mood**
\*\*\*
*Argumentative/Defiant Behavior*
\*\*\*
*Vindictiveness*
\*\*\*
B. The disturbance in behavior is associated with distress in the individual or others in his or her immediate social context \*\*\*, or it impacts negatively on social, education, occupational, or other important areas of functioning.

argued that with such a diagnosis, Marley would likely fabricate facts to get what he desired, stating: "There is nothing they won't do if they have that particular disorder."

¶ 65    Having thoroughly reviewed the record, including the transcripts of the hearing where Natasha's request was denied, we find no basis to find that the trial court abused its discretion in denying this request. Natasha provided no admissible records that could have confirmed Marley's alleged diagnosis of oppositional defiant disorder. She also presented no evidence that a child with this diagnosis has a propensity to lie. Regardless of whether Marley may have been diagnosed years earlier with oppositional defiant disorder, we do not find that his mental condition, following a physical assault by Nathan, was "in controversy," or that Natasha's claims that such a disorder establishes compulsive lying, were correct. Ill. S. Ct. R. 215(a); see also American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, *Oppositional Defiant Disorder* 462-66 (5th ed. 2013). The court asked Natasha's attorney: "Is the psychiatric evaluator going to opine whether this child is telling the truth or not?" Natasha's attorney agreed with the trial court that it would be improper for a psychiatrist to do so. The court then stated: "It is absolutely contrary to any rule of evidence that exists with regard to cross-examination and a court's determination of a witness's veracity." We conclude that the trial court did not abuse its discretion in denying Natasha's request to grant a Rule 215(a) examination. *Doe*, 2015 IL App (1st) 133424-B, ¶ 20.

¶ 66    B. Adjournment of Adjudicatory Hearing to Obtain Psychiatric Records

¶ 67    During the adjudicatory hearing, Natasha's attorney unsuccessfully attempted to introduce Marley's IEPs into evidence to establish his oppositional defiant disorder diagnosis. She sought

---

C. The behaviors do not occur exclusively during the course of a psychotic, substance use, depressive, or bipolar disorder." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, *Oppositional Defiant Disorder* 462-66 (5th ed. 2013).

admission of the IEPs to support her claim that Marley perpetually lies due to this diagnosis. The IEPs were not authenticated by affidavit or sworn testimony and thus were inadmissible. Natasha's attorney then asked the trial court to continue the adjudicatory hearing to have the IEP records certified for proper admission into evidence. Natasha fails to offer any argument regarding how the IEPs from Marley's school—if authenticated and introduced into evidence—would have established that a person with oppositional defiant disorder could never be truthful.

¶ 68    Natasha also sought a continuance of the adjudicatory hearing to better evaluate Marley's new mental health diagnosis of disruptive mood dysregulation disorder.[4] DCFS caseworker Bustos had testified during the adjudicatory hearing that Marley was recently diagnosed with this pediatric mood disorder.

¶ 69    Motions to continue adjudicatory hearings should be viewed with great reservation as there is no absolute right to a continuance. *In re Stephen K.*, 373 Ill. App. 3d 7, 27 (2007). Our Illinois legislature stated: "serious delay in the adjudication of abuse, neglect, or dependency cases can cause grave harm to the minor and the family [because] it frustrates the health, safety and best interests of the minor and the effort to establish permanent homes for children in need." 705 ILCS 405/2-14(a) (West 2022). The purpose of the adjudicatory hearing statute "is to insure that *** the

---

[4]Disruptive mood dysregulation disorder is defined in the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, *Disruptive Mood Dysregulation Disorder* 156-160 (5th ed. 2013) as follows:
"A. Severe recurrent temper outbursts manifested verbally (*e.g.*, verbal rages) and/or behaviorally (*e.g.*, physical aggression toward people or property) that are grossly out of proportion in intensity or duration to the situation or provocation.
    B. The temper outbursts are inconsistent with developmental level.
    C. The temper outbursts occur, on average, three or more times per week.
    D. The mood between temper outbursts is persistently irritable or angry most of the day, nearly every day, and is observable by others (*e.g.*, parents, teachers, peers)." *Id.* at 156.

Criteria A through D must have been present for 12 or more months and the individual with this diagnosis cannot have had a period without all symptoms for 3 of those 12 months. *Id.* The diagnosis of this mental health disorder should not be made for the first time before age 6 or after age 18. *Id.*

State of Illinois will act in a just and speedy manner to determine the best interests of the minor." *Id.* "It is within the juvenile court's discretion whether to grant or deny a continuance motion, and the court's decision will not be disturbed absent manifest abuse or palpable injustice." *In re K.O.*, 336 Ill. App. 3d 98, 104 (2002).

¶ 70    Natasha alleges that she needed the continuance to both authenticate Marley's IEPs and to assess his new psychiatric diagnosis. Inherent in her request was her consistent claim that Marley was a compulsive liar and videotaped his self-imposed injuries to get DCFS's attention. She does not explain how the IEPs with its "diagnosis" of oppositional defiant disorder and/or the psychiatric records detailing his new diagnosis of disruptive mood dysregulation disorder would disprove that Nathan assaulted Marley or that she failed to protect her children from Nathan. As the trial court correctly observed when entering the adjudicatory order, Marley's claim was partially corroborated by both Micah and Melany. Micah was present when Nathan pushed Marley down, and informed DCFS that he was afraid that Nathan would hurt Marley. Although Melany was not present during this incident, she spoke with DCFS and fearfully admitted that Nathan hit all of the children, but primarily Marley. While Marley attempted to withdraw his statements at the house after being spoken to by Natasha and Nathan, he never denied that Nathan assaulted him. Instead, Marley said that Nathan did not intend to hurt him. We find no basis to conclude that the trial court's denial of Natasha's request to continue the adjudicatory hearing so she could obtain school and psychiatric records constituted an abuse of discretion. *Id.*

¶ 71                                III. CONCLUSION

¶ 72    For the foregoing reasons, we affirm the orders entered by the Marion County circuit court during the adjudicatory hearing denying the request to order a Supreme Court Rule 215(a) mental

28

health examination and denying the request for a continuance to obtain psychiatric hospital medical records. We affirm the trial court's adjudicatory and dispositional orders.

¶ 73    Affirmed.